**HARRY WILSON**, OSB No. 077214
harrywilson@markowitzherbold.com
**DALLAS DELUCA, OSB No. 072992**
dallasdeluca@markowitzherbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: 503-295-3085

**CHRISTOPHER D. DODGE**
D.C Bar. No. 90011587
**BRANDEN LEWISTON**
D.C. Bar. No. 252550
ELIAS LAW GROUP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
cdodge@elias.law
blewiston@elias.law

**ABHA KHANNA**
WA Bar No. 42612
**WALKER McKUSICK**
WA Bar No. 63205
ELIAS LAW GROUP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
akhanna@elias.law
wmckusick@elias.law

*Attorneys for Proposed Intervenors*
*Our Oregon, Dan DiIulio, Stephen Gomez,*
*and Emma Craddock*

**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
EUGENE DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

v.

THE STATE OF OREGON; and
TOBIAS READ, in his official capacity as the
Oregon Secretary of State,

        Defendants.

Case No. 6:25-CV-01666-MTK

**<u>OUR OREGON, DAN DIIULIO, STEPHEN GOMEZ, AND EMMA CRADDOCK'S
MOTION TO INTERVENE AS DEFENDANTS AND MEMORANDUM IN SUPPORT</u>**

# TABLE OF CONTENTS

LOCAL RULE 7-1(A) CERTIFICATION ............................................................................. 1

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.    Federal law has long made voter list maintenance a state responsibility, consistent
      with the constitutional separation of powers. ........................................................... 3

II.   The Department of Justice has embarked on an unprecedented nationwide campaign
      to collect personal voter registration data held by the states. ................................. 4

III.  The Department of Justice sues Oregon to obtain its complete voter registration list. .......... 5

IV.   Intervenors' sensitive personal information is placed in jeopardy by DOJ's demands. ......... 7

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

I.    Proposed Intervenors are entitled to intervene as of right. .................................... 11

   A.    This motion is timely. ....................................................................................... 11

   B.    Proposed Intervenors have an interest in protecting their sensitive and personal
         information from improper disclosure to DOJ. ................................................. 12

   C.    The existing parties do not adequately represent Proposed Intervenors. ....................... 15

II.   Alternatively, Proposed Intervenors should be granted permissive intervention. ............... 18

CONCLUSION ................................................................................................................... 19

## LOCAL RULE 7-1(A) CERTIFICATION

Counsel for Our Oregon, Dan DiIulio, Stephen Gomez, and Emma Craddock reached out to counsel for plaintiff The U.S. Department of Justice and defendants the State of Oregon and Tobias Read.  Plaintiff opposes this motion. Defendants do not oppose this motion.

## INTRODUCTION

The U.S. Department of Justice recently embarked on an unprecedented nationwide campaign to compile sensitive personal information on voters in a centralized federal database. As part of this effort, DOJ sued Oregon last week, seeking to compel the state to turn over all the voter information it has on all of its voters. This legal assault intrudes not only upon Oregon's constitutional prerogative to maintain and protect its own voter registration list—it directly intrudes upon the privacy rights of individual Oregonians who have good reason to fear their personal information being handed over to the federal government.

Accordingly, Our Oregon, Dan DiIulio, Stephen Gomez, and Emma Craddock move to intervene in this suit to defend against the federal government's overreach. Our Oregon, An organization that fights for economic and social fairness for all Oregonians, seeks to intervene both to preserve the privacy rights of community members across Oregon and to protect its own mission-critical ability to politically empower communities worried about retaliation and scrutiny from the federal government. The remaining intervenors—each a civically-engaged registered Oregon voter—move to intervene to protect their privacy rights and prevent the improper disclosure of their sensitive and personal information to DOJ. Oregon law guarantees voters that their information—such as driver's license numbers, partial social security numbers, and dates of birth—shall "not be disclosed by" the state. *See* Or. Rev. Stat. § 247.948(2). DOJ's requested relief would run roughshod over these privacy protections, which Proposed Intervenors seek to preserve.

Proposed Intervenors are entitled to intervention as of right because they have significant interests that are at severe risk of impairment by this action, and the existing parties do not adequately represent those interests. *See* Fed. R. Civ. P. 24(a). Most significantly, they unquestionably have an interest in ensuring their own sensitive and personal information—and in Our Oregon's case, the personal information of community members they serve—is not improperly disclosed to DOJ, particularly since Oregon law explicitly protects such information. While Oregon and its Secretary of State have thus far resisted disclosure, they do not adequately represent Proposed Intervenors; as governmental defendants, they must consider the "broader public-policy implications" of the issues presented in this suit, unlike Proposed Intervenors, who are solely concerned with protecting their privacy, "full stop." *Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196 (2022) (citing *Trbovich v. United Mine Workers*, 404 U.S. 528, 538–39 (1972)). Further still, those defendants have indicated that they be amenable to a partial production of voter registration data, if the DOJ satisfies certain criteria—a compromise position the Proposed Intervenors are unlikely to share. That prospect further confirms that the Proposed Intervenors cannot blindly rely upon the existing Defendants to defend Proposed Intervenors' interests at stake in this case.

Alternatively, Proposed Intervenors should be granted permissive intervention under Rule 24(b), the requirements of which are readily satisfied. Doing so will ensure that Oregon voters have a voice in this litigation concerning the disclosure of their sensitive and personal information.

## MOTION

Pursuant to Federal Rules of Civil Procedure 24(a) and (b), Our Oregon, Dan DiIulio, Stephen Gomez, and Emma Craddock move to intervene as defendants. This motion is accompanied by a pleading that sets out the claim or defense for which intervention is sought.

## BACKGROUND

### I.    Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers.

The U.S. Constitution "invests the States with responsibility for the mechanics" of federal elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* Const., Art. I, § 4, cl. 1. Accordingly, as a default matter, the Constitution assigns states the responsibility for determining voter eligibility and maintaining lists of eligible voters. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

While Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that states are the custodians of voter registration data. In 1993 Congress enacted the National Voter Registration Act ("the NVRA") to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). The law charges *states*—not the federal government— with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including as to maintaining voter lists (subject to strict procedural safeguards), *id.* § 20507(c)-(g). It similarly makes *states* the custodians of voter lists, *see Husted*, 584 U.S. at 761.

In the wake of the 2000 elections, Congress enacted the Help America Vote Act ("HAVA") "to improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th Cir. 2024). Like the NVRA, HAVA regulates how *states*

maintain voter registration lists, requiring them to create a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1). It also requires states to "perform list maintenance" consistent with the NVRA. *Id.* § 21083(a)(2). HAVA is abundantly clear that this list is to be "defined, maintained, and administered at the *State* level." *Id.* § 21083(a)(1)(A) (emphasis added). Indeed, HAVA's legislative history stressed the importance of maintaining our decentralized electoral system to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. This system has many benefits that must be preserved. The dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome. This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

*See* H.R. Rep. No. 107-329(I) at 31–32 (2001).

Consistent with that principle, neither the NVRA nor HAVA tasks the *federal government* with compiling a federal national voter registration list or micromanaging the states in their maintenance of such lists. Congress has traditionally "left it up to the States to maintain accurate lists of those eligible to vote in federal elections," *Husted*, 584 U.S. at 761, subject only to the *specific* requirements of the NVRA and HAVA, which purposefully operate through the states themselves—not DOJ and the federal government.

## II.    The Department of Justice has embarked on an unprecedented nationwide campaign to collect personal voter registration data held by the states.

This Spring, DOJ launched a campaign to demand broad and unprecedented access to state voter files, including personal information about each registered voter. To date, DOJ has sent demands to over thirty-five states, with plans to make similar demands on all fifty states.[1] It seeks

---

[1] *See* Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N. Y. Times (Sept. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

to use the data to create a national voter database that will, in turn, be used to seek to substantiate President Trump's unfounded accusations that millions of non-citizens have voted illegally in recent elections. *See* Barrett & Corasaniti, *supra* n.1. The vast majority of states that have received such demands—including those led by Republican officeholders—have refused to comply, declining to turn over sensitive personal information that is typically protected by state law.[2]

DOJ sent Oregon a letter on July 16, 2025, demanding, among other things, Oregon's "statewide voter registration list." ECF No. 1 ¶ 35. DOJ reiterated its requests on August 14, explaining that the "purpose of the request is to ascertain Oregon's compliance with the list maintenance requirements of the NVRA and HAVA." *Id.* ¶ 51. DOJ also demanded that Oregon produce "*all fields*" from its voter registration database, including "the registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number." *Id.*

Oregon Secretary of State Tobias Read declined to produce a full, unredacted copy of Oregon's voter registration list. *Id*. ¶ 55. In an August 21 letter, Secretary Read disputed whether "federal law compels the production of state voter rolls." Ex. F (August 21 Letter from Secretary Read). Nonetheless, despite this lack of "federal authority for [DOJ's] request," the Secretary held out the prospect that his office might "produce the voter-registration data required by state law" so long as DOJ makes assurances to comply with the federal Privacy Act. *See id.*

### III.    The Department of Justice sues Oregon to obtain its complete voter registration list.

DOJ filed this suit on September 16, seeking to compel Oregon to provide its full statewide

---

[2] *See* Jonathan Shorman, *Some Republican states resist DOJ demand for private voter data*, Stateline (Sept. 18, 2025), https://stateline.org/2025/09/18/some-republican-states-resist-doj-demand-for-private-voter-data/ (reporting only one state—Indiana—has so far given DOJ everything it sought).

voter registration list. ECF No. 1 at 21. DOJ cited three federal statutes to justify its claims: the NVRA, HAVA, and the Civil Rights Act of 1960. *Id.* None supports DOJ's sweeping demand.

*First*, though the NVRA requires states to permit public inspection of certain records, 52 U.S.C. § 20507(i)(1), courts have consistently held that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in" those records, such as driver's license numbers, partial social security numbers, and dates of birth. *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) (collecting cases).

*Second*, unlike the NVRA, HAVA has no disclosure provisions at all, and DOJ's complaint and letters cite no case law or other authority for the radical proposition that the mere existence of DOJ's authority to enforce HAVA's "uniform and nondiscriminatory" requirements entitles it to unfettered access to state voter registration lists upon demand. 52 U.S.C. § 21111.

*Third*, as a last-ditch effort, DOJ invokes Section 303 of the Civil Rights Act of 1960, a long dormant Civil Rights era law that permits DOJ to review certain voting records to investigate "question[s] concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). Congress enacted the law to preserve "the right of all qualified citizens to vote without discrimination on account of race," and specifically to facilitate "investigations" authorized under the Civil Rights Act of 1957, which recalcitrant local officials had frustrated through the destruction of records. H.R. Rep. 86-956 at 1944 (1959). This history "leaves no doubt but that [Section 303] is designed to secure a more effective protection of the right to vote." *Alabama ex rel. Gallion v. Rogers,* 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U. S.*, 285 F.2d 430 (5th Cir. 1961). But DOJ admits that is not its purpose here; rather it claims to be evaluating Oregon's list maintenance efforts under NVRA and HAVA—statutes with their own separate disclosure rules (under the NVRA specifically) and

enforcement mechanisms. *See* Compl. ¶ 4. Thus, the Civil Rights Act is inapplicable here.[3]

## IV.  Intervenors' sensitive personal information is placed in jeopardy by DOJ's demands.

Proposed Intervenors include a statewide organization, Our Oregon, dedicated to fighting for economic and social fairness for all Oregonians, *see* Ex. B, Declaration of Michele Ruffin ("Ruffin Decl.") ¶ 3, as well as several civically-engaged, registered Oregon voters whose sensitive and personal information will be disclosed to DOJ if its efforts prevail, *see generally* Ex. C, Declaration of Daniel DiIulio ("DiIulio Decl."); Ex. D, Declaration of Stephen Gomez ("Gomez Decl."); Ex. E, Declaration of Emma Craddock ("Craddock Decl."). Oregon law guarantees these voters that the sensitive and personal information they disclose when registering to vote—such as driver's license numbers, social security numbers, and dates of birth—is "not subject to inspection as a public record" and "may not be disclosed by" the state. Or. Rev. Stat. . § 247.948(2).

In addition to defending their privacy interests, Proposed Intervenors have well-founded concerns about DOJ's intended use of their sensitive and personal voter information, particularly given that they hold political views and engage in civic activities disfavored by the current presidential administration, which has repeatedly disregarded privacy protections over sensitive personal data.[4] *See* DiIulio Decl. ¶¶ 5; Gomez Decl. ¶¶ 3–7; Craddock Decl. ¶¶ 5–6.

---

[3] Even if Section 303 did apply, it does not prohibit states from redacting confidential and sensitive voter information that has nothing to do with investigating the denial of the right to vote, just as they may under the NVRA. *See Pub. Int. Legal Found.*, 92 F.4th at 56.

[4] For example, public reports have indicated that the Department of Government Efficiency (DOGE) placed the security of millions of Social Security numbers at risk through improper maintenance. *See* Nicholas Nehamas, *DOGE Put Critical Social Security Data at Risk, Whistle-Blower Says*, N.Y. Times (Aug. 26, 2025), https://www.nytimes.com/2025/08/26/us/politics/doge-social-security-data.html. Just this past week, the National Archives allegedly released the military records of a New Jersey gubernatorial candidate in violation of the Privacy Act, with the apparent aim of seeking to help her opponent. *See* Caroline Vakil, *Sherrill campaign slams release of military records to opponent's ally*, The Hill (Sept. 25, 2025), https://thehill.com/homenews/campaign/5522531-trump-admin-leaks-sherrill-records/.

**Our Oregon.** Our Oregon is a social welfare organization committed to fighting for the economic and social rights of all Oregonians. *See* Ruffian Decl. ¶ 3. It works across the state to advance progressive change on labor and worker rights issues, educational issues, environmental issues, LGBTQ+ issues, and civil rights. *Id.* Critical to that mission is the ability to turn out voters to support candidates and causes aligned with Our Oregon's mission. *See id.* ¶¶ 3–5. This frequently requires Our Oregon to politically activate communities that are marginalized or vote at lower rates than the rest of the population. *See id.* ¶¶ 6, 8–9. The organization's ability to do so will be directly frustrated by DOJ's effort to obtain a complete, unredacted state voter file, as many of Our Oregon's constituents and supporters fear federal retaliation and scrutiny. *See id.* ¶¶ 7–10, 13–14. This is particularly so among marginalized communities that have recently felt the ire of the current administration, including working class immigrant communities. *See id.* ¶¶ 8–9. Our Oregon fears that voters in these communities—a key part of the organization's coalition—will simply choose to disengage from the political process, rather than face the prospect of federal scrutiny and retaliation. *See id.*

Moreover, as an organization that routinely uses Oregon's *public* state voter registration file—which contains more limited information than the full, unredacted file—Our Oregon appreciates the need for responsible stewardship of every voter's personal information. *See id.* ¶ 11. That DOJ demands even more data than what Oregon makes publicly available is deeply concerning to Our Oregon. *See id.* ¶¶ 11–13.

**Daniel DiIulio.** Mr. DiIulio is a registered voter in Jackson County, Oregon. *See* DiIulio Decl. ¶ 2. He has lived in Ashland with his family since 2023. *See id.* ¶ 2. Since moving to Ashland, he has been an active volunteer in environmental and conservation efforts across southern Oregon. *See id.* ¶ 3. Mr. DiIulio is very concerned about his personal information being turned over to the

federal government and will be less comfortable exercising his right to vote if that occurs. *Id.* ¶ 5. This concern stems in substantial part from his own experience performing law enforcement duties during his 12 years of service with the U.S. Coast Guard, where he learned firsthand just how much sensitive personal data the federal government already has access to and how readily it can be misused. *See id.* ¶¶ 6–7. He has grave doubts that the federal government is seeking the personal information of every Oregon voter for legitimate law enforcement purposes and does not trust them to properly maintain such data. *See id.* ¶¶ 7–8.

**Stephen Gomez.** Mr. Gomez is a registered voter in Multnomah County, Oregon. *See* Gomez Decl. ¶ 2. Since retiring as an executive from Nike, Mr. Gomez has dedicated his time to civic service and non-profit work in the Portland area. *See id.* ¶ 3. Among other efforts, he serves on the Board of Directors for Portland for All, an organization dedicated to improving Portland by promoting civic engagement, political organization, and voter education. *See id.* ¶ 4. Mr. Gomez directly volunteers in this civic engagement work, which seeks to mobilize voters in the Portland area, including low propensity voters who do not regularly participate in the political process. *See id.* . He is acutely concerned about having his own personal data turned over the federal government, particularly given his progressive activism and the current administration's track record of retaliating against its political opponents. *See id.* ¶¶ 5–6. He also fears that DOJ's efforts will frustrate the civic engagement work he does with Portland for All, as the DOJ's overreach is likely to make lower propensity voters skeptical of participating in elections. *See id.* ¶¶ 7–9.

**Emma Craddock.** Ms. Craddock is a registered voter in Multnomah County, Oregon. *See id.* ¶ 2. She is a lifelong Oregon resident and registered to vote promptly after turning 18 years old. *See id.* . Ms. Craddock is politically engaged in local and statewide politics and regularly participates in political protests and writes to public officeholders on causes she cares about. *See*

*id.* ¶ 3. She is deeply concerned about the privacy rights of Oregon voters, as well as her own. In particular, Ms. Craddock has been disturbed by public reports about the current presidential administration misusing personal data to retaliate against its political opponents and those who disagree with the administration's policies. *See id.* ¶¶ 4–6 K. She has been particularly alarmed at reports of American citizens being harassed, searched, and interrogated upon reentry to the country from travel abroad. *See id.* ¶¶ 6–7. Ms. Craddock routinely travels abroad and is troubled by the prospect that the federal government will be able to glean additional data about her voting habits, particularly given recent examples of such data being misused. *See id.* ¶ 6.

## LEGAL STANDARD

To determine whether an applicant has a right to intervene under Federal Rule of Civil Procedure 24(a)(2), courts apply a four-part test:

> (1) the motion must be timely; (2) the applicant must claim a "significantly protectable" interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action.

*Wilderness So'y. v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1481 (9th Cir. 1993)). In applying this test, "[c]ourts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).

Alternatively, the Court has discretion to grant permissive intervention under Rule 24(b) if the movants show that they "(1) [] share[] a common question of law or fact with the main action; (2) [their] motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims," *Donnelly v. Glickman,* 159 F.3d 405, 412 (9th Cir. 1998), though the third

element is not required where—as here—the movants seek to intervene as defendants and do not

seek additional relief, *see Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 844 (9th

Cir. 2011) (explaining third element "does not apply to proposed intervenors in federal-question

cases when the proposed intervenor is not raising new claims"); *see also United States v. City of*

*Portland*, No. 3:12-CV-02265-SI, 2013 WL 12309780, at *3 (D. Or. Feb. 19, 2013) (same).

"Regardless of what type of intervention is sought, the Ninth Circuit upholds a liberal

policy in favor of intervention." *Nw. Env't Advocs. EPA*, No. 3:12-CV-01751-AC, 2014 WL

1094981, at *2 (D. Or. Mar. 19, 2014) (quoting *Wilderness Soc.*, 630 F.3d at 1179).

"Such a policy allows for both efficient resolution of issues and broadened access to the courts."

*Id.* (internal quotation marks and citation omitted).[5]

## ARGUMENT

## I.     Proposed Intervenors are entitled to intervene as of right.

### A.     This motion is timely.

In determining whether a motion for intervention as of right is timely, courts consider the

totality of the circumstances facing the movant, with a focus on three factors: "(1) the stage of the

proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the

reason for and length of the delay." *W. Watersheds Project v. Haaland*, 22 F.4th 828, 835–36 (9th

Cir. 2022).

Proposed Intervenors' motion is indisputably timely. DOJ filed suit on September 16, and

this motion follows only 10 days later—before any case schedule has been set, before any

Defendants have answered, and while this case remains at the preliminary stage.

---

[5] In compliance with Rule 24(c), Proposed Intervenors attach a proposed "pleading" to their
motion. (*See* Ex. A). Proposed Intervenors reserve the right to file a Rule 12 motion in accordance
with any deadline set by the Court or the Federal Rules.

Allowing intervention would not require altering any existing deadlines, and Proposed Intervenors agree to abide by any future deadlines set by the Court or agreed to by the existing parties, so there is no conceivable prejudice to any existing party. *See Or. Nat. Desert Ass'n v. Shuford*, No. CIV 06-242-AA, 2006 WL 2601073, at \*2 (D. Or. Sept. 8, 2006) (finding no prejudice where intervenors moved promptly and agreed "to comply with the court's discovery and pretrial scheduling order"), *aff'd sub nom. Or. Nat. Desert Ass'n v. McDaniel*, 405 F. App'x 197 (9th Cir. 2010). Proposed Intervenors therefore satisfy the timeliness factor for intervention as of right.

### B. Proposed Intervenors have an interest in protecting their sensitive and personal information from improper disclosure to DOJ.

"[A] prospective intervenor 'has a sufficient interest for intervention purposes if it will suffer a practical impairment of its interests as a result of the pending litigation.'" *Wilderness Soc'y*, 630 F.3d at 1179 (quoting *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006)). Consistent with its liberal standard, "Rule 24(a)(2) does not require a specific legal or equitable interest," *id.* (citing *County of Fresno v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980)), and "[i]t is generally enough that the interest is protectable under some law, and that there is a relationship between the legally protected interest and the claims at issue" *id.* (quoting *Sierra Club v. EPA*, 995 F.2d 1478, 1484 (9th Cir. 1993)). "[T]he 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Id.* (cleaned up). Applicants thus need not show that impairment is a "certainty," only that "disposition of the action 'may' practically impair a party's ability to protect their interest in the subject matter of the litigation." *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 900 (9th Cir. 2011) (quoting Fed. R. Civ. P. 24(a)(2)). Once an applicant has shown some protectible interest, courts generally "have little difficulty concluding

that the disposition of [a] case may, as a practical matter, affect" those interests. *California ex rel. Lockyer*, 450 F.3d at 442.

Proposed Intervenors self-evidently satisfy that standard here. Most obviously, each of the individual intervenors have a significant and protectable interest—their personal voter registration data, which is legally safeguarded under Oregon law—that is at serious risk of disclosure through the outcome of this action. *See* DiIulio Decl. ¶¶ 3–8; Gomez Decl. ¶¶ 4–9; Craddock Decl. ¶¶ 4–7. Each of these individuals strenuously opposes surrendering their personal information to the federal government and has legitimate concerns about the consequence of doing so. *See* DiIulio Decl. ¶ 5; Gomez Decl. ¶ 6; Craddock Decl. ¶ 4. Several fear retaliation or unwarranted scrutiny due to their political activism and civic service, *see, e.g.*, Gomez Decl. ¶ 6; Craddock Decl. ¶ 5, and each fears that the data will not be properly protected and is liable for misuse, *see, e.g.*, DiIulio Decl. ¶ 8; Gomez Decl. ¶ 9; Craddock Decl. ¶ 7. Mr. DiIulio in particular, has firsthand experience as a law enforcement officer at the federal level and has an acute appreciation for the federal government's ability to wield such information. *See* DiIulio Decl. ¶¶ 6–8. He fears that, once his data is released to the Department of Justice, there will be no way for him to restore the privacy of such information. *Id.* ¶ 8. These personalized interests in deeply private and personal information readily satisfy the requirements of Rule 24(a)(2). *See, e.g.*, *Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 827 (9th Cir. 2021) (recognizing "straightforward" significantly protectable interest in confidentiality of non-public documents); *Jurj v. Andersen*, No. 3:21-CV-00088-YY, 2022 WL 19349528, at *4 (D. Or. Sept. 16, 2022) (recognizing significantly protectable confidentiality interest); *cf. Celgard LLC v. Targray Tech. Int'l Inc.*, No. SAMC20-00128, 2021 WL 831030, at *2 (C.D. Cal. Feb. 10, 2021) (recognizing that disclosure of confidential commercial information is a "well-established interest sufficient to justify intervention under Rule 24(a)" (quotation marks

and citation omitted)). The fact that this privacy interest implicates the right to vote bolsters the interest here as well, as each of these individuals has a substantial interest in preserving their "right to vote privately," *Powell v. Benson*, No. 20-CV-11023, 2020 WL 5229104, at \*5 (E.D. Mich. Sept. 2, 2020), and in ensuring that their right to vote is not unlawfully burdened, *e.g.*, *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 434–35 (5th Cir. 2011) (reversing denial of intervention and concluding voting right interest was "a sufficient interest to satisfy Rule 24(a)(2)").

Our Oregon has a similar interest in preserving the privacy rights of the voters it seeks to enfranchise through its statewide voter engagement work. *See* Ruffin Decl. ¶¶ 7–10. But it has a further interest as well in being able to preserve its own ability as an organization to activate voters, particularly in communities that fear retaliation and harassment from the federal government. *See id.* ¶¶ 8–9. For example, Our Oregon's coalitional efforts often involve working with agricultural workers in Oregon, a group of voters disproportionately comprised of naturalized citizens and first-generation immigrants. *See id.* ¶ 8. In view of the current administration's harsh treatment of immigrant communities, many voters in this group—even those plainly qualified to vote—may be hesitant to engage in the political process if it means inviting federal scrutiny and retaliation of their families and communities. *See id.* ¶¶ 8–9. The distrust sown by the DOJ's aggressive demands for personal information will therefore directly frustrate Our Oregon's work. *See id.* ¶¶ 8–9, 13–14. Mr. Gomez's circumstances are similar, as his work promoting civic engagement with Portland for All will become more difficult if the federal government is able to invade the privacy of individuals Mr. Gomez seeks to enfranchise. *See* Gomez Decl. ¶¶ 4, 7. Courts have long recognized that organizations have a significant protectable interest in preserving and pursuing their own mission-critical organizational activities, particularly when it comes to ensuring their constituents'

ability to vote. *See, e.g.*, *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2042365, at *2 (D. Nev. Apr. 28, 2020); *Issa v. Newsom*, No. 2:20-CV-01044-MCE-CKD, 2020 WL 3074351, at *3 (E.D. Cal. June 10, 2020); *cf. La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 306 (5th Cir. 2022) (recognizing that a political party had a "legally protectable interest" because they "expend significant resources in the recruiting and training of volunteers and poll watchers who participate in the election process").

Indeed, these interests are so stark that they frequently satisfy the even greater requirements for showing an Article III injury or irreparable harm. *See, e.g.*, *Democratic Nat'l Comm. v. Reagan*, 329 F. Supp. 3d 824, 841 (D. Ariz. 2018) (concluding organization had injury sufficient to confer standing where challenged law would require it "to retool [its] [get-out-the-vote] strategies and divert [] resources"), *rev'd on other grounds sub nom. Democratic Nat'l Comm. v. Hobbs,* 948 F.3d 989 (9th Cir. 2020) (en banc); *Mi Familia Vota v. Fontes*, 719 F. Supp. 3d 929, 983–87 (D. Ariz. 2024) (finding organizations had standing to protect members' voting rights), *aff'd in relevant part* 129 F.4th 691 (9th Cir. 2025); *March for Our Lives Idaho v. McGrane*, No. 1 :23-CV-00107-AKB, 2023 WL 6623631, at *7 (D. Idaho Oct. 11, 2023) (similar); *cf. Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096-97 (9th Cir. 2021). The fact that the Proposed Intervenors can likely satisfy even the "more stringent" requirement of Article III standing "compels the conclusion that they have an adequate interest" for purposes of Rule 24. *Yniguez v. Ariz.*, 939 F.2d 727, 735 (9th Cir. 1991).

### C.    The existing parties do not adequately represent Proposed Intervenors.

Proposed Intervenors cannot be assured adequate representation in this matter if they are denied intervention. "[T]he burden of making this showing is minimal" and is "satisfied if the applicant shows that representation of its interests may be inadequate." *Hoopa Valley Tribe v. U. S. Bureau of Reclamation*, 648 F. Supp. 3d 1196, 1204 (E.D. Cal. 2022) (quoting *Sagebrush*

*Rebellion Inc. v. Watt*, 713 F.2d 525, 528 (9th Cir. 1983)); *see also Berger v. N.C. State Conf. of the NAACP*, 597 U.S. 179, 196 (2022) (citing *Trbovich v. United Mine Workers.*, 404 U.S. 528, 538 n.10 (1972)). Accordingly, courts are "liberal in finding" this requirement satisfied because "there is good reason in most cases to suppose that the applicant is the best judge of the representation of the applicant's own interests." 7C Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1909 (3d ed. 2024). Because Proposed Intervenors' interests are distinct, none of the existing parties adequately represent them.

DOJ naturally does not represent Proposed Intervenors' interests, as they seek to forcibly compel production of Oregon's unredacted state voter registration list. While Oregon and its Secretary of State have, to date, resisted that demand, they too do not adequately represent Proposed Intervenors' specific interests. Federal courts have "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003). This is because a government-official defendant's interests are "necessarily colored by [their] view of the public welfare rather than the more parochial views of a proposed intervenor whose interest is personal to it." *Kleissler v. U.S. Forest Serv.*, 157 F.3d 964, 972 (3d Cir. 1998) (explaining that the burden in these circumstances is "comparatively light"). Simply put, "the government's representation of the public interest may not be 'identical to the individual parochial interest' of a particular group just because 'both entities occupy the same posture in the litigation.'" *Citizens for Balanced Use*, 647 F.3d at 899 (quoting *WildEarth Guardians v. U.S. Forest Serv.*, 573 F.3d 992, 996 (10th Cir. 2009)).

The Supreme Court recently emphasized this point, explaining that public officials must "bear in mind broader public-policy implications," whereas private litigants—like Proposed Intervenors—seek to vindicate their own rights "full stop." *Berger*, 597 U.S. at 195–96 (quoting

*Trbovich*, 404 U.S. at 538 n.10). Thus, the Supreme Court cautioned that courts should not conduct the adequacy of representation analysis at too "high [a] level of abstraction," and reaffirmed that, even where the parties' interests "seem[] closely aligned," the burden to demonstrate inadequate representation remains "minimal" unless those interests are "identical." *Id.* at 196 (citation omitted). In other words, even if Oregon and the Secretary also oppose the relief that DOJ seeks at a high level of abstraction, it does not follow that they share "identical" interests to private individual voters or civic organizations committed to voter engagement and turnout. *See id.*

Here, the existing Defendants and Proposed Intervenors do not share "identical" interests. For one, the existing Defendants are obliged to enforce the requirements of the NVRA and HAVA, in addition to various state laws governing maintenance of the voter registration list. Thus, by definition, they have an obligation to weigh and carry out public duties that Proposed Intervenors do not share. *See, e.g.*, *Bellitto v. Snipes*, No. 16-cv-61474, 2016 WL 5118568, at *2 (S.D. Fla. Sept. 21, 2016) (concluding adequate representation was not guaranteed where existing defendant was "an elected official" whose interpretation of the NVRA might not be aligned with intervenors' interests). Indeed, the NVRA specifically requires them to "balance competing objectives"— maintaining accurate and current voter rolls while promoting access to the ballot box—that do not pertain to the Proposed Intervenors or their interests. *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019). Proposed Intervenors do not share these competing interests—they are focused entirely on maintaining the privacy of their sensitive personal information—whereas the State Defendants' competing interests as governmental bodies may push them to settle. Courts regularly find inadequate representation where an existing party may resolve a case on terms that Proposed Intervenors would not agree to. *E.g.*, *City of Chicago v. Fed. Emergency Mgmt. Agency*, 660 F.3d 980, 986 (7th Cir. 2011) (explaining that a possible "conflict of interest . . . when it comes to

settlement possibilities" favors intervention); *Kleissler*, 157 F.3d at 974 (similar); *cf. United States v. City of Portland*, No. 3:12-cv-02265-SI, 2013 WL 12309780, at *5 (D. Or. Feb. 19, 2013) (finding lack of adequate representation where parties disagreed as to terms of settlement agreement).

At bottom, the government entities and public officials on both sides of the case do not stand in the same shoes as Proposed Intervenors and thus do not sufficiently represent their interests, which are directly impacted by the disposition of this matter.

## II.    Alternatively, Proposed Intervenors should be granted permissive intervention.

This Court should alternatively exercise its discretion to grant permissive intervention. Rule 24(b) is readily satisfied: Proposed Intervenors assert a "defense that shares with the main action a common question of law or fact," and granting intervention would not "unduly delay or prejudice the adjudication" of the matter. Fed. R. Civ. P. 24(b). Proposed Intervenors have moved promptly, *see supra* Section I.A, and agree to abide by any schedule set by the Court or agreed to by the original parties, meaning there will be no delay or prejudice. And Proposed Intervenors' defense requires resolution of the same factual and legal issues raised in the underlying lawsuit. (*See* Ex. A) (Proposed Intervenors' Proposed Answer).

The Ninth Circuit has also identified additional considerations the Court can consider in weighing permissive intervention requests. *See Callahan v. Brookdale Senior Living Cmtys., Inc.*, 42 F.4th 1013, 1022 (9th Cir. 2022). Those considerations—including the proposed intervenors' interests, the adequacy of the representation for their interests, and the intervenors' contribution to the factual and legal issues, *see id.*—buttress the case for intervention here.

First, Proposed Intervenors seek to defend deeply personal privacy interests, as well as organizational interests unique to civic organizations. *See supra* Section I.B. Second, these

parochial interests are not identical to the public interests of the existing, governmental defendants, *see supra* Section I.C, and may not be fully advanced absent their intervention. Finally, the harms vulnerable voters face and the arguments they advance will certainly contribute to the "full development of the underlying factual issues in the suit and to the just and equitable adjudication of the legal questions presented." *Callahan*, 42 F.4th at 1022 (quoting *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977)). It is for these reasons that courts routinely grant permissive intervention to civic organizations and individual voters to ensure their voices are heard when litigation implicates the rights and privacy of all voters. *See, e.g.*, *1789 Found. Inc. v. Fontes*, No. CV-24-02987-PHX-SPL, 2025 WL 834919, at *4 (D. Ariz. Mar. 17, 2025) (permitting advocacy organizations to intervene as defendants); *Pub. Int. Legal Found., Inc. v. Winfrey*, 463 F. Supp. 3d 795, 802 (E.D. Mich. 2020) (permitting voting rights organizations to intervene as defendants); *League of Women Voters of N.C. v. North Carolina*, No. 1:13CV660, 2014 WL 12770081, at *3 (M.D.N.C. Jan 27, 2014) (permitting individual voters to intervene).

Thus, because Rule 24 is liberally construed to protect Proposed Intervenors' rights and interests, and because Proposed Intervenors' participation will assist rather than prejudice the efficient development and resolution of this matter, the Court should grant permissive intervention if it does not find that Proposed Intervenors may intervene as of right.

## CONCLUSION

For all of the foregoing reasons, Proposed Intervenors respectfully request that the Court grant them intervention as of right—or in the alternative grant permissive intervention—to allow them to protect their sensitive personal information from disclosure.

September 26, 2025

Respectfully submitted,

*/s/ Harry Wilson*
**HARRY WILSON**, OSB No. 077214
harrywilson@markowitzherbold.com
**DALLAS DELUCA**, OSB No. 072992
dallasdeluca@markowitzherbold.com
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97201
Telephone: 503-295-3085

**ABHA KHANNA***
WA Bar No. 42612
**WALKER McKUSICK***
WA Bar No. 63205
ELIAS LAW GROUP
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
akhanna@elias.law
wmckusick@elias.law

**CHRISTOPHER D. DODGE***
D.C Bar. No. 90011587
**BRANDEN LEWISTON***
D.C. Bar No. 252550
ELIAS LAW GROUP
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
cdodge@elias.law
blewiston@elias.law

*Pro Hac Vice Applications Forthcoming

*Attorneys for Proposed Intervenors*
*Our Oregon, Daniel DiIulio, Stephen*
*Gomez, and Emma Craddock*