**United States of America v. State of Oregon, et al.
USDC NO: 6:25-cv-01666-MTK
State Defendants Motion to Dismiss
Exhibit 5**

# Calendar No. 1241

| 86TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 1205 |
|---|---|---|

## CIVIL RIGHTS ACT OF 1960

MARCH 29, 1960.—Ordered to be printed

Filed under authority of the order of the Senate of March, 29, 1960

Mr. HENNINGS, from the Committee on the Judiciary, submitted the following

# REPORT

[To accompany H.R. 8601]

The Committee on the Judiciary, to which was referred the bill (H.R. 8601) to enforce constitutional rights, and for other purposes, having considered the same, reports the bill in conformity with instruction of the Senate, with amendments.

### STATEMENT

By order of the Senate, agreed to March 24, 1960, H.R. 8601, to enforce constitutional rights, and for other purposes, was referred to the Committee on the Judiciary, with instruction to report back to the Senate not later than midnight Tuesday, March 29, 1960.

The committee met in executive session on March 28 and 29, 1960, during which time testimony was received from the Attorney General of the United States, William P. Rogers; the Deputy Attorney General, Lawrence E. Walsh, and the special deputy attorney general of the State of Georgia, Charles J. Bloch.

The committee considered numerous amendments. The amendments agreed to by the committee are set forth in the bill as reported to the Senate.

O

69002°—60    S. Rept., 86-2, vol. 2——19

**Calendar No. 1241**

| 86TH CONGRESS<br>*2d Session* | SENATE | Rept. 1205<br>Part 2 |
|---|---|---|

# CIVIL RIGHTS ACT OF 1960

APRIL 1, 1960.—Ordered to be printed

Mr. HART, (on behalf of himself, Mr. HENNINGS and Mr. DODD) from the Committee on the Judiciary, submitted the following

## SEPARATE VIEWS

[To accompany H.R. 8601]

### SUMMARY

During the Judiciary Committee's consideration of H.R. 8601, we urged and supported the addition of a new title to the bill proposing the establishment of a Federal enrollment officer procedure to insure that voting rights of American citizens shall not be denied because of race or color.

Such a plan as we urged in the committee, and which received the support of six members of the committee, would not replace the present title of the bill proposing a system of voting referees. Rather it would be an alternative procedure in no way in conflict with the voting referee proposal.

It is now abundantly clear to us, in reviewing the debates in the House of Representatives, the various drafts of the voting referee proposal, amendments which have been adopted, and the testimony of the Attorney General and the Deputy Attorney General before our committee, that there are endless pitfalls and shortcomings inherent in relying solely on the judicial approach involved in the voting referee procedure. The basic difficulty with this referee proposal as the only available procedure is that it will place in the Federal court system registration and election functions and responsibilities which are not properly judicial. And this will be done in the face of already over-burdened Federal courts in many of the areas most likely to be affected.

We believe that the Congress should provide the additional methods for solving the problem of racial disfranchisement contained in the enrollment officer plan. These are: (1) discretionary action by the President in appointing enrollment officers upon notification of a successful suit under section 131(c) of the Civil Rights Act of 1957; or (2) similar action upon a finding based on complaints filed with the Civil Rights Commission. Such additions to the present bill would offer to the Attorney General and to the President alternatives.

49006

2                        CIVIL RIGHTS ACT OF 1960

They could proceed under whichever system—the court referee approach or the Federal enrollment officer approach—that seemed most effective and least disruptive of the local and State operations of registration and voting laws.

Congress, when it passed the voting provisions of the Civil Rights Act of 1957, believed they would be effective tools in fulfilling the Federal Government's responsibilities under the 14th and 15th amendments to the Constitution. Under those amendments, the Congress clearly has the powers to *enforce* the guarantees set forth in them. To date, this assumption with respect to the 1957 act has proved wrong. Now, for the second time in less than 3 years, this problem of assuring full rights of suffrage to all Americans is again before the Congress. Let us provide sufficient mechanisms and alternatives to overcome systematic disfranchisement. For 8 weeks Congress has debated; the Nation is aware of the issues. To fail to provide effective legislation now might well prove worse for our Nation than the possibility that there had been no debate and no legislation at all.

It seems to us that there is very great logic in an alternative approach such as we recommend to our colleagues. The referee approach carries with it punitive threats, from possible criminal and/or contempt proceedings, for every local and State official connected with the voting and registration processes in the affected area. Such threats are not inherent in the efficient operations of the enrollment officer plan. Unless there is a clear showing of potential threat to and obstruction of the right of enrolled voters to vote, few if any local election officials will be involved in litigation under this procedure. If such threats were forthcoming once the system is in operation, the Attorney General would then immediately invoke the equity powers of the Federal court to protect and insure the enforcement of the act.

For 90 years, the judicial approach has not been effective. We have very serious doubts that the referee approach will add more than a very few Americans to the voting lists. Addition now of the enrollment title will mean that an alternative method will be available—a method recommended by the Civil Rights Commission, created by Congress for this purpose.

### SEPARATE VIEWS

We urged that the committee include the enrollment officer plan in the bill as well as the voting referee plan for the following reasons:

(1) The Congress has invested much time and money this year in its consideration of civil rights legislation. We have doubts as to the validity and effectiveness of the voting referee plan provided in H.R. 8601, and we think it a mistake to rely solely on this plan in the legislative efforts to protect and implement the constitutional voting rights of many hundred thousands of our fellow citizens now deprived of these rights because of their race or color. We do not want to rely solely on one method, especially when we are not sure of the strength of that basket. There is no need to rely on the one procedure when we can adopt two without any basic conflict between them. Insofar as they are each effective the two systems can supplement and strengthen each other.

CIVIL RIGHTS ACT OF 1960                                    **3**

(2) We have doubts as to the constitutionality of the referee plan. Under article III of the Constitution, Congress cannot impose on a court an obligation to make findings or decisions which are not necessary to decide the *case* or *controversy* which is properly before it.

Under the revised referee plan as contained in H.R. 8601 the court would, upon request of the Attorney General in cases brought to enforce voting rights guaranteed by the 15th amendment, be *obligated* to make a supplemental finding as to whether the voting deprivations are pursuant to a pattern or practice. If the court finds affirmatively on the question of pattern or practice, under the bill the court may appoint "voting referees" to aid it in determining whether Negro applicants are qualified to vote and thus initiate the voting referee procedure. We doubt whether article III permits Congress to compel the courts to make supplemental findings such as that of existence of a pattern or practice. In the case before it the court would have made particular findings of deprivation of voting rights. It would have entered an order against the State registration officials who were parties defendant in the case. The supplemental findings that "a pattern or practice of discrimination" exists would not be needed to support the original findings that particular persons had been deprived of their voting rights.

(3) Our other principal objection to the referee plan is that it is likely to be ineffective. We believe that not very many Negroes will become registered or qualified to vote as a result of the referee plan. We believe it will not be effective in achieving the broad objective of providing a procedure by which qualified citizens heretofore disfranchised because of their race can vote if they so choose. In the first place under the referee plan no qualified Negroes heretofore denied a vote may even take the first step down the long road to the voting booth unless and until the Attorney General initiates a lawsuit in the U.S. district court for that registration area. But let us assume that the case is brought, the original order entered, the supplemental finding made, and the referee appointed. The bill then requires those Negroes who are ambitious for the suffrage and courageous enough to attempt to get a qualifying certificate and order from the court protecting their right to vote, first to attempt to be registered and turned down by the local State registrars. This is the very area in which the court has found a pattern or practice of discrimination against the Negroes. Only after this humiliating experience may they apply to the court-appointed referee for a voting certificate with any hope of success. This was bad enough but a further hurdle was added by a committee amendment. The Negro applicants must face a public trial of their voting qualifications. The local or State registration officials who had previously rejected their request to be qualified as a voter, or the lawyers of such officials, are to be present at the trial and possibly too the most hostile elements of the white community. One has only to read the report of the Commission on Civil Rights which describes at some length the various techniques used by local and State registrars and others to prevent Negroes from becoming registered voters to realize what a formidable obstacle to Negroes the requirement of the referee proposal will be.

**Exhibit 5, Page 5 of 16**

There is one further serious objection to the referee plan as contained in H.R. 8601. It provides as follows:

> Notwithstanding any inconsistent provision of State law or the action of any State officer or court, an applicant so declared qualified to vote shall be permitted to vote in any such election. The Attorney General shall cause to be transmitted certified copies of such order to the appropriate election officers. *The refusal by any such officer with notice of such order to permit any person so declared qualified to vote to vote at an appropriate election shall constitute contempt of court.*

This provision means that State election officials can only at the peril of being held in contempt of court, challenge the right to vote of a Negro who has been "declared qualified to vote" by a Federal court order. This language appears absolute and makes no provision for exceptions and contingencies. It makes no exception for the case of a person who, after being found qualified to vote by the court, moves away from the election district or area, or fails to pay his poll tax or, for some other reason occurring since the court's order, would not be qualified under State law. The State election officials faced with a court order, would permit such a person to vote, and might well be in violation of State law. Perhaps the State election officials could let the Negro voter, protected by a court order, vote under a challenge but the language of the bill makes no explicit provision for such a contingency.

Our enrollment officer amendment, on the other hand, especially provides that State election officials and other appropriate and interested persons may challenge any prospective voter registered by the Federal enrollment officer, subject to later determination by the appropriate Federal court in an action brought by those making the challenge. In this wise the enrollment officer procedure protects the valid interest of the State and of individual citizens to prevent unqualified persons from voting, and at the same time allows all Negro applicants who are certified to cast their ballots.

For these reasons we think the Congress should not rely solely on the "referee plan" to implement the right to vote of qualified Negroes presently disfranchised because of their race or color.

Briefly, for the following reasons we think the enrollment officer procedure should be added to the bill to insure, insofar as we can, an effective piece of legislation:

The enrollment officer plan avoids the constitutional problem that arises when the Congress attempts by legislation to compel the courts to make supplemental findings that voting deprivations are pursuant to a "pattern or practice." It does this by providing that whenever in an action brought by the Attorney General a court finds that a State official, acting under color of law, has deprived Negroes of the right to vote because of their race or color, the Attorney General is to notify the President of this fact. In his discretion the President then may appoint an enrollment officer. The court is not required to make a finding that the deprivation of voting rights is done pursuant to a pattern or practice as would be the case under the court referee proposal.

The Attorney General may bring few actions to enforce voting rights. Since 1957 he has, in fact, brought only four cases of this type.

For this reason, in the enrollment officer plan a second basis is provided for the Presidential appointment of enrollment officers. If the Commission on Civil Rights, acting under its present authority, makes a similar finding of racial voting disfranchisement, it is to notify the President of this fact. The President may then in his discretion use these findings as a basis for appointing enrollment officers for the area where the voting deprivations occur.

Once the enrollment officer for a given area is appointed it becomes his responsibility to determine whether, under the State law, applicants who appear before him are properly qualified. There is no court procedure and no State or local officials are made defendants of a lawsuit (other than the original suit and none at all if the President acts on the basis of a finding by the Civil Rights Commission rather than a finding by a judge). The enrollment officer carries out his function. He is on the other side of the street from the State or local registrar and in no way interferes with State officials. He merely registers Negroes qualified to vote under State law. The State officials on the other hand are given the right to challenge the prospective Negro voter—but at the right time—on election day at the polls. The ballots are cast and counted and those challenged are impounded for later court decision. This procedure would be direct, simple, and effective.

Attorney General William P. Rogers and others have stated flatly that the enrollment officer plan would be ineffective because it would not insure that the voter, registered under it, would actually be permitted to vote.

The Attorney General has argued that under this procedure the prospective voter would end up with nothing but the certificate of the enrollment officer which would be worthless because the State or local election officials would refuse to honor it. We do not agree.

In taking this position, the Attorney General is overlooking the extent of the powers he now has under existing law and of those which would in addition be given him under the enrollment officer procedure. Our amendment provides that the Federal district courts would be authorized to enforce the provisions contained in our amendment, including the provision giving enrolled voters the right to vote, subject, of course, to proper challenge at the polls. To enforce the act, the courts would be empowered to issue on request of the Attorney General "permanent and temporary injunctions or *other orders*." In the first place, if the local U.S. attorney has information substantiating his probable belief that State officials or others intend to interfere with a Negro voter's rights on election day, he can properly ask for an injunction restraining the suspected persons from any contemplated interference.

If the Attorney General has information that local election officials are preventing or are about to prevent enrolled voters from voting, under section (b) of rule 65 of the Federal Rules of Civil Procedure he could request the issuance immediately of a temporary restraining order compelling local officials to refrain from interfering, on pain of otherwise being held in contempt of court. On the basis of specific facts shown by a verified complaint or affidavit by the U.S. attorney that immediate and irreparable injury, loss, or damage (defeat of the constitutional guarantees and of the directive to Congress to implement them contained in the 15th amendment) would otherwise result,

rule 65 provides that a Federal judge may grant the temporary restraining order mentioned above. This temporary restraining order can be granted on the basis of a very brief ex parte hearing without notice to the State officials or others who may be restrained by such order. While an extraordinary remedy, this type of order can be secured within a matter of minutes on a proper showing. For instance, if the polls on election day are opened at 6 o'clock and if by 6:30 Negroes are being denied the right to vote, by 8 o'clock the U.S. marshal should have been able to serve the temporary restraining order compelling the State election officials to honor the enrollment certificate.

All the Attorney General has to do is carry out his oath of office with appropriate zeal, industry, and ingenuity. He can plan ahead for possible violations, alert his attorneys and the local FBI offices, shore up weak spots in his organization and notify both Federal judges and State officials that he will protect the rights of registered voters with all the resources and vigor of which the Department of Justice is capable. If this be done, the certificate given a qualified Negro voter will not be worthless but, on the contrary, will be honored. We ask the Congress to provide the necessary machinery for the task.

## SCHOOL DESEGREGATION

We believe that this year's civil rights bill should be amended to include provisions intended to help ease the school desegregation crisis. This is a glaring weakness in the bill before the Senate. According to the Southern Education Reporting Service (see chart I), by May 1959, 5 years after the Supreme Court decision, some 797 of the 2,907 school districts having both races in the 17 Southern States and the District of Columbia had been desegregated. Further analysis of this situation reveals that six States, Alabama, Florida, Georgia, Louisiana, Mississippi, and South Carolina, have completely segregated public schools; five States, Arkansas, Delaware, North Carolina, Tennessee, and Virginia, have permitted beginning or "token" desegregation at the local level; and six States and the District have undertaken comprehensive efforts to comply with the Supreme Court decision. Each of these situations present different problems. Each requires a somewhat different solution. In addition, there is evidence that school district gerrymandering and other devices have resulted in segregated school areas in some northern and western communities. All of these conditions require action by the Congress.

In 1957, Congress had before it a proposal to authorize the Attorney General to initiate injunctive relief suits on behalf of citizens complaining that they were being denied equal protection of the law. It approved authority of this kind for the voting field. It is still urgently needed in other fields to give support to those seeking their constitutional rights but who cannot afford the lengthy and costly procedures involved in Federal court cases. Illustrative of this burden is the total time taken in the *Aaron* v. *Cooper* case in Little Rock, Ark. From the filing of the first petition to the time set for full compliance with the court order 9 years elapsed. Experience with such cases in Virginia has been comparable. This is an intolerable differential for citizens supposedly guaranteed equal rights under the Constitution. The authority contained in the so-called title III or part III

which was not included in the 1957 act is essential to any new civil rights bill. It is the same type of authority already given the Attorney General by 50 other statutes now on the books.

Another important reason why this power should be given the Attorney General is to provide a practical and moderate means of restoring "deliberate speed" toward achieving the constitutional imperative of the court's decision. Regrettably, all of the States having segregated school systems have enacted State laws designed to prevent desegregation. Voluntary desegregation has gradually been slowing down—from a high of 297 districts in 1955 to 61 in 1957 to 37 in 1958. Without intervention by the Attorney General, it may well grind to a halt. We cannot, as a nation, tolerate another 90 years of segregation in our schools.

### TECHNICAL ASSISTANCE

In those States that have undertaken "token" desegregation, as well as those that have initiated comprehensive programs, there has developed a demonstrated need for the kinds of technical and financial assistance contained in S. 810, S. 3045, and various other measures. If a local school board, desiring to comply with the law, finds need for assistance, it should not be prevented by the State. It is most important that such assistance be made available directly to the local school board requesting it *without approval by State officials*. In this regard, the administration's proposal is unacceptable (S. 3001). The Commission on Civil Rights in its report commented on this question as follows:

> If State governments do not permit local school officials to develop such plans for good-faith compliance the effectiveness of the school system in the State as a whole will be impaired (p. 325).

The report goes on to say:

> It is important that any transition should not result in the lowering of educational standards for either the white or Negro student. If possible, it should result in an improvement of educational standards for both (p. 325).

It is clear that there are school boards willing to consider plans for desegregation. They are burdened with such considerations as inadequate plant, understaffed faculties, wide differentials in teacher preparation, inadequate programs of community relations and interpretation. Financial and technical assistance to meet these problems must be made available to local communities willing to take steps toward desegregation. The House bill must be amended to include them.

CHART I

*Progress in desegregation of school districts, 1954–59*

| | Total number of school districts, 1958–59 | Number having both white and Negro pupils 1958–59 | Number of districts newly desegregated in the school year beginning September— | | | | | Total desegregated, May 1959 | Number desegregated by court order | Number segregated, May 1959 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1954 | 1955 | 1956 | 1957 | 1958 | | | |
| Alabama | 113 | 113 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 113 |
| Arkansas | 423 | 228 | 2 | 2 | 1 | 4 | 0 | 9 | 1 | 219 |
| Delaware | 97 | 57 | 13 | 0 | 1 | 0 | 0 | 14 | 2 | 43 |
| District of Columbia | 1 | 1 | 1 | -- | -- | -- | -- | 1 | 0 | 0 |
| Florida | 67 | 67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 67 |
| Georgia | 200 | 198 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 198 |
| Kentucky | 215 | 175 | 0 | 37 | 71 | 8 | 7 | 123 | 7 | 52 |
| Louisiana | 67 | 67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 67 |
| Maryland | 24 | 23 | 1 | 8 | 11 | 3 | 0 | 23 | 2 | 0 |
| Mississippi | 151 | 151 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 151 |
| Missouri | 3,600 | 243 | 114 | 39 | 40 | 16 | 2 | 211 | 0 | 33 |
| North Carolina | 172 | 172 | 0 | 0 | 0 | 3 | 1 | 4 | 0 | 168 |
| Oklahoma | 1,469 | 271 | 0 | 124 | 70 | 22 | 22 | 238 | 4 | 33 |
| South Carolina | 107 | 107 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 107 |
| Tennessee | 152 | 141 | 0 | 1 | 1 | 1 | 0 | 3 | 2 | 138 |
| Texas | 1,650 | 722 | 1 | 73 | 48 | 1 | 1 | 124 | 0 | 598 |
| Virginia | 129 | 128 | 0 | 0 | 0 | 0 | 4 | 4 | 4 | 124 |
| West Virginia | 55 | 43 | 22 | 13 | 0 | 5 | 3 | 43 | 4 | 0 |
| Total | 8,692 | 2,907 | 154 | 297 | 248 | 61 | 37 | 797 | 26 | 2,111 |
| Number acting under court order, by years | | | 2 | 3 | 4 | 9 | 9 | | | |

Source: Report of the U.S. Commission on Civil Rights, 1959, p. 296.

CIVIL RIGHTS ACT OF 1960                     9

### OTHER PROVISIONS

The above provisions would produce a really effective bill. Other proposals have merit. Even though it would not significantly alter the limited authority already available to it under the Executive order, we support the proposal to establish the President's Committee on Government Contracts by legislation. We believe the referee proposal would be less cumbersome by deleting the requirement that the citizen must go back to the State or local registration official *after* the Federal court has found a pattern and practice of discrimination against his class exists.

### CONCLUSIONS.

We believe the bill reported by the Judiciary Committee to be inadequate unless amended and strengthened. We recommend the bill include the following:

(*a*) An enrollment officer plan as an alternative procedure to the judicial referee plan.

(*b*) Authority for the Attorney General to obtain injunctive relief in school and other violations of equal protection of the law.

(*c*) Technical and financial assistance for school districts moving to undertake desegregation in compliance with the Supreme Court decision. Local boards should not be required to obtain approval from State officials.

THOS. C. HENNINGS, Jr.
THOMAS J. DODD.
J. P. BOYD.
PHILIP A. HART.

I dissent with some of the statements and conclusions contained in the report entitled "separate views" but agree generally with the objectives desired.

JOHN A. CARROLL.

# APPENDIXES

### Appendix I

#### ANALYSIS OF THE PROPOSED FEDERAL ENROLLMENT OFFICER AMENDMENT TO H.R. 8601

This amendment provides that from among Federal officers and employees who are registered voters the President may in his discretion appoint enrollment officers who are authorized to enroll applicants to vote whom they determine meet the voting qualifications under State law. The President is authorized to take this action if either of two things happen: (1) a Federal court finds that under color of law or by State action *persons* have been deprived of the right to register or vote because of their race, or (2) the Commission on Civil Rights makes a similar finding pursuant to its responsibilities under the Civil Rights Act of 1957. This procedure is purely administrative in those cases where the Commission's findings are used as the basis for the Presidential appointments. Even in those cases where the district judge's findings are relied on it is administrative from the time when the district judge makes his finding. The President does not need to wait until the Supreme Court has made a final decision in a case after appeal. Once a district judge has made a finding of racial discrimination in voting in a case brought by the Attorney General, the Attorney General notifies the President and the President acts in his discretion and of course may delay appointing enrollment officers during a period of grace in which to give State officials a final chance to administer their State registration and election laws properly under the Constitution without intervention of the Federal Government.

The other important thing to keep in mind concerning this amendment is that it provides for State officials and individual citizens of a State a day in court, but places that day after an election has been held and challenged votes have been cast, counted, and separately preserved. This procedure protects all the essential litigious rights of States and citizens, but prevents obstructions to the effective voting by Negroes.

#### BRIEF POINT-BY-POINT ANALYSIS OF THE PROPOSED FEDERAL ENROLLMENT OFFICER AMENDMENT TO H.R. 8601

Section 701(a) makes findings that continual denial of rights under the 14th and 15th amendments requires congressional action.

(b)(1) defines elections to include any general or special election or primary.

(b)(2) defines registration district for the purposes of this legislation to correspond with a congressional district. An area this large is used for two reasons: (1) If for purposes of administering this

10

amendment the registration district or area established under State law has used a State which wished to resist the enrollment of qualified Negroes to the bitter end could by State law greatly increase the number of registration districts and decrease their size to very small units and thereby utterly frustrate administration of H.R. 8601 (the Rogers' "referee" plan will encounter difficulties on this score).   (2) By providing an area as large as a congressional district, as the registration district under the amendment, the President should have no difficulty finding a Federal officer or employee of sufficient stature in the part of the State where he lives and votes to serve as "enrollment officer."

(c)(1) provides that whenever under section 131(c) of the Civil Rights Act of 1957 a court finds that under the color of law or by State action persons have been deprived of the right to register because of race, the Attorney General shall notify the President.

(c)(2) makes a similar provision concerning a finding of voting discrimination because of race by the Commission on Civil Rights.

(d)(1) provides that the President, upon notification of a finding either by the Attorney General or the Civil Rights Commission, is authorized to appoint a Federal enrollment officer of among Federal employees qualified to vote in the congressional district.  It further provides that when the President determines there is no further need for the office he may abolish the office, and that the individual appointed enrollment officer shall perform the duties until relieved of them by the President.

(d)(2) provides that the President may in his discretion delay the appointment of an enrollment officer in order to permit prompt and continuous good-faith effort by State and local officials to comply with the requirements of the 14th and 15th amendments.  This provision was added to this amendment in keeping with the proposal put forward by Senator Lyndon Johnson.

(e) provides that the enrollment officer, when appointed shall accept applications and shall enroll all applicants whom he finds to meet the qualifications for voters under the laws of the State and these enrolled voters are qualified to vote for the period provided under State law. The successful applicants are to be given certificates of enrollment and the enrollment officer is directed to provide State and local officials with notification concerning the persons whom he has enrolled.

The last paragraph of (e) provides: "Nothing contained in this section shall be construed as impairing the right of any State to establish nondiscriminatory voting qualifications."

(f) provides that each voter enrolled by the Federal enrollment officer shall have the right to vote and have the vote counted subject to provisions of section (g).

(g)(1) provides that nothing in the amendment shall be construed to deny appropriate State officials or other interested persons of the right to challenge the eligibility of voters at the time of elections.  It further provides that if challenged, however, the voter shall be permitted to cast his vote and have it counted, but the vote shall be preserved subject to a later determination of the validity of the challenge in an appropriate action before a U.S. judge.

(g)(2) provides that enrollment officers shall ascertain that persons enrolled by him are afforded the right to vote and have their votes counted and for this purpose is authorized to attend the voting and counting on election day.  This subsection further provides that if

12                    CIVIL RIGHTS ACT OF 1960

any enrolled person is denied the right to cast his vote or have the
vote counted, this fact shall be forthwith given to the Attorney
General.

(g)(3) provides civil and equitable proceedings to enforce the pro-
visions of the amendment and to give immediate injunctive relief
if a voter is interfered with on election day at the polls.

(g)(4) sets forth the provisions contained in the Civil Rights Act
of 1957 for cases of criminal contempt.

———

## Appendix II

CONSTITUTIONAL CONSIDERATIONS CONCERNING THE PROPOSED
FEDERAL ENROLLMENT OFFICER AMENDMENT TO H.R. 8601

The authority of Congress to enact the Federal enrollment officer
procedure contained in proposed title VII to H.R. 8601 stems from
the "necessary and proper" clause of section 8, article I, and from
the second sections of amendments 14 and 15 of the Constitution, each
of the latter reading as follows: "Congress shall have power to enforce
this article by appropriate legislation."

In other words, the Congress in its wisdom may enact appropriate
legislation to implement the 14th and 15th amendments.

The appointment by the President of enrollment officers upon noti-
fication that either a Federal judge or the Commission on Civil Rights
has found that persons have been denied the right to vote because of
race or color is clearly "appropriate legislation."

We have not been unmindful that the Supreme Court in holding
unconstitutional certain provisions of the Civil Rights Act of 1875
pointed out that unlike the powers of Congress to regulate commerce,
to coin money, and to establish post offices and post roads, which
are plenary and direct, the powers of Congress under the 14th and
15th amendments must be predicated upon an abrogation or denial
by the States of the rights intended to be protected by the amend-
ments (*Civil Rights Cases*, 109 U.S. 3, 17–18 (1883)).

In only two cases, however, has the Supreme Court held unconstitu-
tional congressional enactments for the enforcement of the prohibitions
of the 15th amendment.   In *United States* v. *Reese* (92 U.S. 214 (1875),
sections 3 and 4 of the act of May 31, 1870, were held unconstitutional
on the ground that they attempted to reach voting abridgments by
States for reasons other than race or color.   In *James* v. *Bowman* (190
U.S. 127 (1903)) another section of that act which became Revised
Statute, section 5507 was held unconstitutional because it attempted
to reach acts of individuals.

The only voting denials or abridgments prohibited by the 15th
amendment are those which have two characteristics: (1) They are
done under color of law or by State action (or by U.S. action).   (2)
They are done by reason of race, or color, or previous condition of
servitude.   It is only to such denials that this bill is directed.   Even
while holding two sections of the 1870 act unconstitutional the Court
in the *Reese* case, supra, acknowledged that if legislation be predicated
upon the violation of the right or immunity intended to be protected
by the 15th amendment "The form and manner of the protection
may be such as Congress, in the legitimate exercise of its legislative

discretion, shall provide. These may be varied to meet the necessities of the particular right to be protected" (*United States* v. *Reese*, 92 U.S. 214, 217 (1875) cited in *Strauder* v. *West Virginia*, 100 U.S. 303, 311 (1879)).

Some persons thought that Congress does not have the power to authorize Federal officers to determine whether individuals were qualified to vote under State laws. Yet, in statements submitted to the Committee on Rules and Administration by some eminent professors of law not one gave any indication that the power of Congress was so limited. While it may be quite true that in the exercise of its powers under the 15th amendment, Congress could not provide Federal machinery to administer all State election laws just to be sure that no State violated the amendment's prohibitions, it is also true that when some State action has been taken, either through its laws or its officers, which is adverse to the rights protected by the 15th amendment, Congress may provide in advance to meet such exigency when it arises by enacting legislation necessary and proper for counteracting such State action (*Civil Rights Cases*, 109 U.S. 3, 13–16 (1883)).

The enrollment officer proposal predicated upon the findings of the Congress and the Civil Rights Commission that there are instances in which the prohibitions of the 15th amendment have been and are continuing to be violated by State action. Although this alone is a sufficient basis for corrective action by Congress, the proposed amendment provides remedies to meet this particular evil and no other. It provides also for a termination of the extraordinary procedures when the prohibited actions have ceased. The only constitutional question is whether the legislation is appropriate for the enforcement of the prohibitions of the 15th amendment. The classic statement on the meaning of "necessary and proper" is that of Mr. Chief Justice Marshall in *McCulloch* v. *Maryland*:

"Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional" (4 Wheat. 316, 421 (1819); see also *Hepburn* v. *Griswold*, 75 U.S. 603, 614–15 (1869); *Legal Tender Cases*, 79 U.S. 457, 533–34 (870)).

In *Ex parte Virginia*, the Court discussed the meaning of the declaration "the Congress shall have power to enforce by appropriate legislation the provisions of this article," which appears in the 13th and 14th amendments, as well as in the 15th. The opinion deals with, and answers, so many objections similar to those heard by the committee to all of the proposals considered by it, e.g., that they usurp the rights of the States to administer their own laws, that a rather long portion of it deserves a place in an appendix to the statement of our views.

"One great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States. They were intended to take away all possibility of oppression of law by race or color. They were intended to be, that they really are, limitations of the power of the States and enlargements of the power of Congress. They are to some extent declaratory of rights, and though in form prohibitions, they imply immunities such as may be protected by congressional legislation.

"All of the amendments derive much of their force from this * * * provision (for congressional enforcement by means of appropriate legislation). It is not said that the *judicial power* of the General Government shall extend to enforcing the prohibitions and to protecting the rights and immunities guaranteed. It is not said that branch of the Government shall be authorized to declare void any action of a State in violation of the prohibitions. It is the power of Congress which has been enlarged. Congress is authorized to *enforce* the prohibitions by appropriate legislation. Some legislation is contemplated to make the amendments fully effective. Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, * * * if not prohibited, is brought within the domain of congressional power.

"Nor does it make any difference that such legislation is restrictive of what the State may have done before the constitutional amendment was adopted. The prohibition of the 14th amendment (and the 15th amendment) are directed to the States; and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce against State action, however put forth, whether the action be executive, legislative, or judicial. Such enforcement is no invasion of State sovereignty. It is said * * * the administration of her laws belong(s) to each State; that they are her rights. This is true in the general. But in exercising her rights, a State cannot disregard the limitations which the Federal Constitution has applied to her power. Her rights do not reach to that extent. Nor can she deny to the General Government the right to exercise all its granted powers, though they may interfere with the full enjoyment of rights she would have had if those powers had not been thus granted." (*Ex parte Virginia*, 100 U.S. 339, 344–46 (1879).)

○