**United States of America v. State of Oregon, et al.**
**USDC NO: 6:25-cv-01666-MTK**
**State Defendants Motion to Dismiss**
**Exhibit 6**

| 86TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>No. 956 |
|---|---|---|

# CIVIL RIGHTS

---

AUGUST 20, 1959.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. RODINO, from the Committee on the Judiciary, submitted the following

# REPORT

### [To accompany H.R. 8601]

The Committee on the Judiciary to whom was referred the bill (H.R. 8601) to enforce constitutional rights, and for other purposes, having considered the same, report favorably thereon without amendment and recommend that the bill do pass.

### PURPOSE OF THE LEGISLATION

The bill is designed primarily to provide more effective means to enforce the civil rights of persons within the jurisdiction of the United States. In furtherance of that objective, the bill proposes to strengthen the penal law with respect to the obstruction of court orders in public school desegregation cases. It proposes to make criminal flight in interstate or foreign commerce to avoid prosecution or punishment for damaging or destroying any building or other real or personal property. The bill provides for preservation of Federal election records and authorizes their inspection by the Attorney General. It amends the Civil Rights Act of 1957 so as to extend the existence of the Civil Rights Commission for 2 years. Finally, it contains a proposal to enable the Federal Government to provide for the education of all children of the members of our Armed Forces, whether they are or are not residents on Federal property, when public schools have been closed because of desegregation decisions or orders.

### HISTORY OF THE LEGISLATION

Shortly after the convening of the 86th Congress, many bills concerning civil rights were introduced and referred to the Committee on the Judiciary.

★

CIVIL RIGHTS

On February 5, 1959, the President of the United States transmitted to the Congress a message of recommendations pertaining to civil rights (H. Doc. No. 75, 86th Cong., 1st sess.).   On the same day executive communications which implemented the message of the President were forwarded to the Congress by the Attorney General, Secretary of Labor, and the Secretary of Health, Education, and Welfare.

A Judiciary Subcommittee conducted hearings on the 39 bills which had been referred to it.   These proposals related to almost every aspect and facet of civil rights, including such topics as voting, antilynch, fair employment practices, equal protection of the laws, crimes involving discrimination and deprivation of civil rights, school desegregation, Civil Rights Commission, Joint Congressional Committee on Civil Rights, and authorization for the Attorney General to institute civil actions to protect and enforce civil rights.

The hearings were held on March 4, 5, 11, 12, 13, 18, 19; April 14, 15, 16, 17, 22, 23, 24, 29, 30; May 1, 1959 (civil rights hearing before Subcommittee No. 5 of the Committee on the Judiciary, House of Representatives, 86th Cong., 1st sess., serial No. 5).

During the course of those hearings, the testimony—while it related to all the subjects of the legislative proposals—was devoted primarily to two bills, H.R. 3147 and H.R. 4457, introduced by Representatives Celler and McCulloch, respectively.   The witnesses represented all of the various interests concerned with the legislation; the witnesses included the congressional authors of the proposals, other Members of Congress, the Attorney General, the Secretaries of Labor and of Health, Education, and Welfare, representatives of the Civil Rights Commission and of the President's Committee on Government Contracts, State officials—Governors, attorneys general, members of State legislatures, local officials—private citizens as well as representatives of various organizations concerned with the legislation.   The subcommittee afforded to all who were interested a reasonable opportunity to present their views and interests on the proposals.   Those who did not appear personally were given the opportunity to submit for the record any relevant matter.

After the hearing, the subcommittee met in executive sessions to consider the bill H.R. 3147: It struck out of that proposal all after the enacting clause and inserted in lieu thereof an amendment in the nature of a substitute.   The substituted proposal consisted of a combination of the legislative provisions contained in the bills, H.R. 3147 and H.R. 4457, and the amended version was recommended to the full Judiciary Committee.

The substitute version of the legislation before the full Judiciary Committee contained nine titles.   Briefly, these were:

1. Obstruction of Court Orders in School Desegregation Cases.
2. Flight To Avoid Prosecution for Destruction of Educational or Religious Structures.
3. Authorization to the Attorney General To Institute Civil Proceedings To Protect the Right to Equal Protection of the Laws.
4. Preservation of Federal Election Records.
5. Extension of the Civil Rights Commission for 2 Years.
6. Creation of a Commission on Equal Job Opportunity Under Government Contracts.

7. Provision for the Education of Children of Members of the Armed Forces.

8. Provision for Grants To Assist State and Local Educational Agencies To Effect Desegregation.

9. A General Separability Provision.

The full Judiciary Committee, in its deliberation and consideration of the amended bill H.R. 3147, adopted six of the recommendations of the subcommittee, namely, the obstruction of court orders, flight to avoid prosecution with a broadened provision to include the destruction of any building or other real or personal property, preservation of Federal election records, extension of the Civil Rights Commission for 2 years, education of children of members of the Armed Forces and, finally, a separability title. Certain other amendments were made in each of these titles with the exception of that title relating to the education of children of members of the Armed Forces. Thus eliminated were the titles relating to the authorization to the Attorney General and the Commission on Equal Job Opportunity Under Government Contracts and grants to assist State and local educational agencies to effectuate desegregation. After the full committee had approved this substitute version of H.R. 3147, the chairman introduced a clean bill, H.R. 8601 which contained the titles as amended and approved by the full Judiciary Committee. That bill, H.R. 8601, was referred to the Committee on the Judiciary and the full committee then ordered it reported without amendment.

GENERAL STATEMENT

Since May 17, 1954, the date in which the Supreme Court of the United States rendered its opinion in the school segregation cases, the principle has been recognized that racial segregation sanctioned by law is not equality under the law. This Nation has been cognizant of its moral responsibility of protecting the constitutional rights of all within the jurisdiction of the United States. By the enactment of the Civil Rights Act of 1957, Congress, for the first time since the days of Reconstruction, placed upon the statute books a law designed to implement the constitutional rights provided in the 14th and 15th amendments.

While it is true that over the past 4 years some progress has been made toward achieving the American goal of providing equal opportunity for all and elimination of discrimination because of race, creed, color or national origin, the problem is far from being solved and the ultimate goal still far distant. The hearings conducted on this legislation clearly indicate the need for additional legislation to implement the enforcement of civil rights. There have been instances and incidents of disorder and violence in the field of desegregation in public education, many State statutes have been enacted designed to impede and obstruct the ruling of our Federal courts in desegregation cases as well as examples of interference with the fundamental American right to vote.

H.R. 8601 is designed to assist in the achievement of the great American goal of equal rights for all under the law by strengthening the law enforcement functions of the Federal government. Its objective is to make more certain that the rights guaranteed under the Constitution and the laws of the United States will be enjoyed by all,

regardless of race, creed, color or national origin. It is not directed at any particular section of the country or segment of our population. but its scope is national and its applicability general. It is the opinion of the committee that the enactment of this legislation would provide adequate tools for the protection of rights and privileges guaranteed by the Constitution and the laws of the United States, particularly with regard to the right to vote.

### A SECTIONAL ANALYSIS OF THE LEGISLATION

#### Title I (obstruction of court orders)

Section 101 of the bill proposes to amend chapter 73 of title 18 of the United States Code with respect to obstruction of court orders in school desegregation cases. Accordingly, it amends that title by adding at the end of the chapter a new section. The measure would make it a Federal offense to willfully use force or threats of force to obstruct or impede court orders for school desegregation purposes; upon conviction, the offender could be punished by a fine of not more than $1,000 or imprisonment for not more than 60 days or both.

It further provides that other injunctive or civil relief against the type of conduct made criminal by this proposal is not to be denied on the grounds that such conduct is a crime. In this regard, provision is made that any fine or imprisonment imposed for the violation of such an injunction shall not be in addition to that imposed for a violation of this section.

It further provides for the exemption of the acts of the student, officer, or employee of a school when the act is done at the direction of or is subject to discipline by an officer of the school.

The need for this particular legislation is amply demonstrated by the experience of the occurrence in Little Rock in 1957. While it is true that this section properly covers individual actions, it is contemplated that its use would be principally in coping with concerted action. It is impossible for a democracy to function if mob violence replaces our tested methods of free expression either in judicial or political processes. The Federal Government must have authority to act effectively whenever the execution of the decrees of the Federal court are obstructed by force or threats of force.

It is the opinion of the Department of Justice that there is doubt as to whether the existing authority of Federal courts is sufficient to impose effective sanctions against the members of a mob who, by threats or force, willfully prevent, obstruct, impede, or interfere with the exercise of rights or the performance of duties under a school desegregation order of a Federal court. The objective of this proposal is to remove that doubt. Under Federal procedure, an individual cannot ordinarily be held in contempt of court unless he was either a party against whom the decree was issued or was acting in concert with such a party. Thus it is clear that in an ordinary situation a mob is not in concert with those named in a school desegregation order. The only alternative the Government would have in such a case of mob action would be to return to the court for a new injunction against its leaders and then prove subsequent acts on their part violating the order so as to establish a contempt.

The present obstruction of justice statute (18 U.S.C. 1503) also appears to be inadequate for such a situation. The particular provi-

sion of·that section, namely 4, dealing with one who corrupts or by threats of force endeavors to impede "due administration of justice" would be applicable only if it could be considered that the action involved obstructed or impeded the "due administration of justice." That particular phrase has been a subject of narrow interpretation by the courts and while it is not possible to state categorically that a desegregation decree is beyond the reach of the existing statute, there is much doubt as to whether or not a prosecution of mob leaders could be sustained.    The Department of Justice has recommended the enactment of this provision as a specific and firm responsibility of the proven need for effective Federal action to preserve the lawfully determined rights of individual citizens and the integrity of our Federal judicial system.

*Title II (flight to avoid prosecution for damaging or destroying any building or other real or personal property)*

The proposal would make it a felony, punishable by a fine of not more than $5,000 or imprisonment of not more than 5 years or both, to move in interstate or foreign commerce, to avoid local prosecution, custody, or confinement after conviction for willfully damaging or destroying or attempting to damage or destroy by fire or explosive any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center, or educational institution, public or private. Flight to avoid testifying in criminal proceedings relating to such offenses would likewise be punishable.    Such criminal offenses as these bombings present very difficult investigation and detection problems for local law enforcement agents, for it is one of the most difficult types of crime to solve.    Clues and evidence are ordinarily destroyed by the explosive and more often than not there are very few clues, such as are ordinarily available in other crimes, which would assist in the apprehension of the offender.    It is the type of crime that requires scientific equipment and investigation.    Moreover, the interstate aspects of the offenses demand utilization of the resources and powers of the Federal Government.    It is believed that the Federal Bureau of Investigation can provide the much needed experience and scientific investigative technique to assist—as it has done in the past—local law enforcement officials.    The fugitive felon approach is not new, for the Fugitive Felon Act was enacted in 1934 (18 U.S.C. 1073) and has been the means of punishing persons who travel in interstate commerce with the intent to avoid prosecution of the State law for certain enumerated felonies, or to avoid testifying in State felony proceedings.    This proposal is consistent with that provision as well as with the principle that local crimes are the responsibility of local law enforcement agencies and that in such cases the Federal Bureau of Investigation is not a national police force but acts to supplement State law enforcement.    It is not designed as a substitute for State or local action.

The proposal differs from the Fugitive Felon Act in certain particulars.    While the Fugitive Felon Act applies to flight from prosecution in enumerated common law and statutory felonies, this proposal applies to flight from any prosecution of the willful destruction or damaging by fire or explosive of any building or other real or personal property.    Whether the State prosecution would be for a felony or misdemeanor is immaterial.

CIVIL RIGHTS

Prosecutions under this proposal would be had in the Federal judicial district in which the original crime was alleged to be committed or in which the person is held in custody or confinement. It also contains a specific proviso the purpose of which is to make clear that this section shall not be construed to prevent any State or local body from prosecuting an offense over which they have jurisdiction in the absence of this new section.

The Department of Justice, in its recommendations for the enactment of this section, limited its applicability to those instances of flight to avoid prosecution for the destruction of educational or religious structure only. However, it was the opinion of the committee that this proposal should be broadened so as to encompass flight to avoid prosecution for the destruction of any building or other real or personal property.

*Title III (Federal election records)*

Section 301 would require the retention and preservation for a period of 2 years of any general, special, or primary election records involving candidates for Federal office. The Federal offices are the Office of the President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner of Puerto Rico. It would include all records and papers in the possession of election officers relating to application, registration, payment of poll tax, or any other act requisite to voting in such elections. Provision is made, however, that where such records are required by State law to be deposited with a custodian, such election records may be so deposited and the duty of retention and preservation then devolves upon that custodian. A willful failure to retain and preserve the records is made an offense punishable by a fine of not more than $1,000 or imprisonment for not more than 1 year or both.

Section 302 provides that any person, whether or not an officer of election or custodian, willfully steals, destroys, conceals, mutilates, or alters any of the records required to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than 1 year or both.

Section 303 provides that such records as required to be preserved by this title shall, upon the written demand of the Attorney General or his representative to the party having custody, possession, or control of them shall be made available for inspection, reproduction and copying by the Attorney General or his representative. Demand, however, must contain a statement of the basis and the purpose therefor.

Section 304 provides that when a demand is made by the Attorney General, the record shall be reproduced either at the principal office of the person upon whom the demand is made or at the office of the U.S. attorney in the district in which the records and papers are located.

Section 305 provides that unless ordered by a court of the United States, neither the Attorney General nor his representative nor any employee of the Department of Justice should disclose any record or paper produced pursuant to this title except to the Congress and any of its committees, governmental agencies, or in the presentation of a case or proceeding before a court or grand jury.

Section 306 provides that in the event of nonproduction, jurisdiction would be conferred upon the Federal district courts to resolve any dispute which might arise in connection with the exercise of the authority conferred upon the Attorney General by this title including appropriate process to compel the production of the record or paper.

Section 307 defines the term "officer of election" to include any person who under color of the law performs or is authorized to perform any function, duty or task with any application, registration, payment of poll tax or other act requisite to voting at any one of the enumerated elections at which votes are cast for candidates for the specified Federal offices.

The Department of Justice has recommended the enactment of the substances of this proposal.

The purpose of title III is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race. This is the same purpose contained in the Civil Rights Act of 1957, which authorizes the Attorney General to institute civil proceedings for preventive relief from the discriminatory denial of the right to vote. Experience has shown the need for this legislation. So long as there is lacking a suitable provision for access to voting records during the course of an investigation and prior to the institution of a suit, the authority of the Attorney General is rendered relatively ineffective. The situation requires evidence which is practically impossible to assemble unless access is had to detailed information concerning application, registration, tests, and other acts and procedures requisite to voting.

Moreover, such information is mandatory for a proper evaluation of complaints.

The Department of Justice has no existing power in civil proceedings to require the production of these records during any investigation it may conduct on complaints of a denial to vote because of race. The need for this legislation is evident from the refusal of some State and local authority to permit such inspection. Moreover, the Civil Rights Commission, which does have the power to subpena such records, has found it necessary to utilize its power to compel production. As was said in the recent Alabama case in re *George C. Wallace et al.* (170 F. Supp. 63, 1959), the inspection of voting records—

> must be considered to be an essential step in the process of enforcing and protecting the right to vote regardless of color, race, religion, or national origin.

The constitutionality of the provisions contained in title III of the bill is beyond question of a doubt under the authority of *United States* v. *Classic* (313 U.S. 299), wherein the authority of Congress to legislate concerning any and all elections affecting Federal offices, whether general, special, or primary, as long as they are "an intricate part of the procedure of choice or where in fact the primary effectively controls their choice."

The Department of Justice has recommended the substance provisions of title III of the proposal.

*Title IV (Civil Rights Commission extended for 2 years)*

Section 401 would extend the life of the Civil Rights Commission for an additional 2 years. Under the Civil Rights Act of 1957, the

Commission is required to submit its final report not later than September 9, 1959. Provision is made in this section also for an interim report to be submitted to the President and the Congress not later than September 1, 1959.

Because of circumstances beyond its control, the Civil Rights Commission was not able to commence operations for a number of months following the enactment on September 9, 1957, of the Civil Rights Act. Termination of the existence of the Commission by September of this year would not provide a full opportunity to meet the statutory responsibility imposed upon it by Congress. There is a definite need for further extension in order to make the study and analysis of the problems involved in this complex and difficult field. Moreover, in attempting to carry out the duties imposed upon it by the Congress, the Commission has encountered extensive litigation as indicated by the examples in Alabama and more recently in Louisiana. In these instances, the Commission was concerned with the inspection of election records relative to its study of the question of voting rights.

The Commission has also undertaken programs of research, study, and investigation in the fields of education and housing. Thus the extension of the life of the Commission would permit it to continue its work in these three particular fields as well as new programs in other related fields dealing with equal protection of the laws. It is the opinion of the committee that the best interests of the country would be served by the extension of the life of the Commission.

Section 402 of title III would remove any doubt as to the authority of the members of the Commission to administer oaths. Some questions have been raised as to the power of the Commissioner to administer oaths to witnesses, and it is the purpose of the proposed amendment to remove such doubt. Since existing law requires that complaints submitted to the Commission be under oath of affirmation, it is only proper that the subsequent investigation of that complaint should also be in the form of sworn testimony. The authority provided by this section would facilitate the handling of these complaints particularly during the course of hearings.

Section 403 would amend the Civil Rights Act of 1957, section 105(a), by striking all the words "in accordance with Civil Service and Classification Laws" and inserting "without regard to the provisions of the Civil Service Laws and the Classification Act of 1945, as amended." The Commission, which is a temporary Government agency, has experienced difficulty in obtaining the services of an adequate number of fully qualified personnel for part-time and short tenure employment. This has been true not only on the clerical level but also among professional personnel. It is the opinion of the committee that, as has been done with other commissions of a temporary nature, the requirements for employment under the Civil Service Laws and Classification Act should be removed in order to facilitate the work of the Commission. The Department of Justice has recommended substantive provisions of this title.

*Title V (education of children of members of the Armed Forces)*

Title V would amend Public Laws 815 and 874, 81st Congress, as amended, which authorize Federal payments to school districts which provide free public education to children whose parent resides or works on Federal property which is not subject to State or local taxation.

This title recognizes the unique responsibility of the Federal Government with respect to the education of children of military personnel. Since the members of the Armed Forces serve in communities under orders, their children receive public education as it is provided in the community in which they reside.

The recent closure of certain secondary schools in Norfolk, Va., involved approximately 2,500 school-age children whose parent was on active duty with the Armed Forces in the area. Of that number, 350 children who resided on Federal military posts would have been the only ones for which the Federal Government could have provided schooling if the schools had remained closed. The purpose of this title is to permit the Government to provide for those other children of military personnel who live off Federal property. It is estimated that the proposed legislation could possibly affect the education of some 70,000 children of military personnel situated in States where the closure of schools is a possibility.

Section 6(a), Public Law 874, now requires the Commissioner of Education to make arrangements to provide free public education for children residing on Federal property if the State and its subdivisions may not spend tax revenues for their education or if no local public educational agency is able to provide suitable free public education for them.

Section 501 of the bill would amend section 6(a) to permit the Commissioner to make arrangements also for children of members of the Armed Forces on active duty, whether or not residing on Federal property, where the schools usually provide free public education for them are made unavailable to them by official action of State or local governmental authority and no local public educational agency is able to provide them with suitable free public education.

Subsection (b) of 501 provides complementary amendments to section 6(d) of Public Law 874. The existing provision permits the Commissioner, when he makes the arrangements for provision of education for the federally connected children, to make such arrangements only with a local educational agency or with the Federal agency having jurisdiction over the property on which they reside. Where this new category of children of Armed Forces personnel are involved, arrangements could also be made with the head of the Federal department or agency having jurisdiction over the parents of some or all of the children.

Section 6(d) of Public Law 874 limits the arrangements to those which provide for the use of either facilities situated on Federal property or facilities belonging to a local educational agency. The amendment provided in subsection (b) of section 501 would make this limitation inapplicable where the Commissioner is required to make these arrangements for the new category of children.

Section 502 of title IV of the bill amends Public Law 815, 81st Congress, as amended. The proposal of the bill would authorize the Commissioner of Education to acquire possession of any school building constructed with the aid of Federal funds after the enactment of the proposed amendments contained in this section, when the local educational agency which owns the building is no longer using it for free public education and the Commissioner needs the building to provide education for children of military personnel or for other children who reside on Federal property. While the school remains

10                            CIVIL RIGHTS

in Federal possession, the Commissioner would pay the local district a rental fee proportionate to its share of the cost of constructing the building.

Section 6(b), Public Law 815, 81st Congress, as amended, now requires applications of local educational agencies for the approval of construction projects, which must be filed before the agencies may receive payments to help finance such projects, to contain or be supported by various assurances relating to the authority of the local agency, and other relevant matters. The amendment proposed in section 502 of the bill would add to this provision the requirement of an assurance that any facilities constructed with aid under this law, the application for which is approved after the enactment of the bill, will be made available to the Commissioner in case they are not being used to provide free public education and that the Commissioner need them to provide facilities for the education of children who reside on Federal property or whose parent is on active duty with the Armed Forces. Subsection (b) of section 502 would amend section 10 of Public Law 874.

Subsection (b) of section 502 would amend section 10 of Public Law 815. Existing law now requires the Commissioner to make arrangements for the constructing or otherwise providing the minimum facilities necessary for the education of children who will be residing on Federal property at the end of the next fiscal year if the State and its subdivisions may not spend tax revenues for their education or if no local educational agency is able to provide suitable free public education for them.

Section 502(b) of the bill would amend this section to permit the Commissioner to make such arrangements to provide, on a temporary basis, such facilities for children of the members of the Armed Forces on active duty, whether or not residing on Federal property, where the schools usually providing free public education for them are made unavailable to them by official action of State or local governmental authority and no local educational agency is able to provide them with suitable free public education.

Section 502(c) of the bill further amends section 10 of Public Law 815 by adding a new subsection which authorizes the Commissioner of Education to take possession of facilities constructed with the aid of funds provided for by Public Law 815, under an application approved after the enactment of the bill, if they are not being used for free public education and are needed by the Commissioner, as minimum facilities necessary for the children residing on Federal property or children of the Armed Forces personnel on active duty. Possession would be taken under the terms and conditions prescribed in regulations of the Commissioner of Education. Payment by the Commissioner of a reasonable rental on the portion of the facilities financed with non-Federal funds would be required. Provision is also made for the return of those facilities to the school district when the district reopens those schools and makes them available to the federally connected children or when the Commissioner no longer needs the facilities for direct Federal operation purposes. However, the best interests of the federally connected children, the objectives of this proposal, and the commitments to the personnel employed in the direct Federal operation would be factors to be considered in determining the appropriate time for the return of the facilities.

This title has been recommended by the Department of Health, Education, and Welfare.

*Title VI (separability)*

Section 601 merely provides that if any provision of this act is held invalid, the remainder of the act shall not be affected thereby.

### EXECUTIVE COMMUNICATIONS

There is included at this point in the report, executive communications received from Hon. William P. Rogers, Attorney General of the United States, directed to the Speaker of the House of Representatives and dated February 5, 1959, as well as a similar communication from Hon. Arthur S. Flemming, Secretary of the Department of Health, Education, and Welfare, directed to the Speaker of the House of Representatives and dated February 5, 1959.

FEBRUARY 5, 1959.

The SPEAKER,
*House of Representatives,*
*Washington, D.C.*

DEAR MR. SPEAKER: It is my privilege to transmit for your consideration and appropriate reference the text of four of the seven civil rights legislative proposals recommended by the President and discussed in some detail in his message of this date.

The enclosures are:

1. A bill to strengthen the law with respect to obstruction of court orders in school desegregation cases.

2. A bill to punish flight to avoid prosecution for unlawful destruction of educational or religious structures.

3. A bill to require the preservation of Federal election records and authorizing the Attorney General to inspect them.

4. A bill to extend the life of the Civil Rights Commission for an additional 2 years.

The Bureau of the Budget has advised that the submission of this legislation is in accord with the program of the President.

Sincerely,

WILLIAM P. ROGERS,
*Attorney General.*

A BILL To amend chapter 73 of title 18, United States Code, with respect to obstruction of court orders

That chapter 73 of title 18, United States Code, is amended by adding at the end thereof a new section as follows:

"§ 1509. Obstruction of certain court orders.

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, willfully prevents, obstructs, impedes or interferes with or willfully endeavors to prevent, obstruct, impede or interfere with the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States which (1) directs that any person or class or persons shall be admitted to any school, or (2) directs that any person or class of persons shall not be denied admission to any school because of race or color, or (3) approves any plan of any State or local agency the

effect of which is or will be to permit any person or class of persons to be admitted to any school, shall be fined not more than $10,000 or imprisoned not more than two years, or both.

"No injunctive or other civil relief against the conduct made criminal by this section shall be denied on the ground that such conduct is a crime.

"This section shall not apply to an act of a student, officer or employee of a school if such act is done pursuant to the direction of, or is subject to disciplinary action by, an officer of such school."

"SEC. 2. The analysis of chapter 73 of such title is amended by adding at the end thereof the following:

"1509.   Obstruction of certain court orders."

————

A BILL To provide for the retention and preservation of Federal election records and to authorize the Attorney General to compel the production of such records

That every officer of election shall retain and preserve, for a period of three years from the date of any general, special or primary election at which candidates for the office of President, Vice President, presidential elector, Member of the Senate or Member of the House of Representatives are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that if a State designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

SEC. 2. Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates or alters any record or paper required by section 1 to be retained and preserved shall be fined not more than $5,000 or imprisoned not more than five years, or both.

SEC. 3. Any record or paper required by section 1 to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying by the Attorney General or his representative.

SEC. 4. Any record or paper demanded pursuant to section 3 shall be produced for inspection, reproduction, and copying at the principal office of the person upon whom such demand is made or at an office of the United States attorney in the district in which such records or papers are located.

SEC. 5. Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this Act, or any

reproduction or copy, except as is necessary in the performance of his official duties, including presentation of any case or proceeding before any court or grand jury.

SEC. 6. The United States district court for the district in which a demand is made pursuant to section 3, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.

SEC. 7. As used in this Act, the term "officer of election" means any person who, under color of any Federal, State or local law, statute, ordinance, regulation, authority, custom or usage, performs or is authorized to perform any function, duty or task in connection with any application, registration, payment of poll tax or other act requisite to voting in any general, special or primary election at which candidates for the office of President, Vice President, presidential elector, Member of the Senate or Member of the House of Representatives are voted for.

———

A BILL To amend the Civil Rights Act of 1957 to afford the Civil Rights Commission an additional two years within which to submit its final report, and for other purposes

That section 104(b) of the Civil Rights Act of 1957 (71 Stat. 635; 42 U.S.C. Supp. V 1975c(b)) is amended to read as follows:

"(b) The Commission shall submit an interim report to the President and to the Congress not later than September 1, 1959, and at such other times as either the Commission or the President shall deem desirable. It shall submit to the President and to the Congress a final and comprehensive report of its activities, findings, and recommendations not later than four years from the date of enactment of this Act."

———

A BILL To amend chapter 49 of title 18, United States Code, to punish flight to avoid prosecution for unlawful destruction of educational or religious structures

That chapter 49 of title 18, United States Code, is amended by adding at the end thereof a new section as follows:

"§ 1074. Flight to avoid prosecution for destruction of educational or religious structures.

"Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody, or confinement after conviction, under the laws of the place from which he flees, for willfully damaging or destroying or attempting to damage or destroy by fire or explosive any building, structure, facility or vehicle, if such building, structure, facility or vehicle is used primarily for religious purposes or for the purposes of public or private primary, secondary or higher education, or (2) to avoid giving testimony in any criminal proceeding relating to any such offense—shall be fined not more than $5,000 or imprisoned not more than five years, or both.

"Violations of this section may be prosecuted in the Federal judicial district in which the original crime was alleged to have been committed or in which the person was held in custody or confinement or in the Federal judicial district in which the person is apprehended."

SEC. 2. The analysis of chapter 49 of such title is amended by adding thereto the following:

"1074. Flight to avoid prosecution for destruction of educational or religious structures."

CIVIL RIGHTS

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE,

*February 5, 1959:*

Hon. SAM RAYBURN,
*Speaker of the House of Representatives,*
*Washington, D.C.*

DEAR MR. SPEAKER: I enclose for your consideration two legislative proposals which would enable this Department to discharge responsibilities in the field of public education in accordance with the recommendations of the President in his civil rights message of February 5.

Each of these recommendations is designed to meet separate problems. One would provide, at their request, assistance to certain States and localities in adjusting their school systems to a desegregated basis. The other would amend Public Laws 815 and 874, 81st Congress, to provide for the education of children of members of the Armed Forces in communities where the public schools which they normally attend are closed or otherwise made unavailable to them.

*A. Grants and technical assistance*

The first draft bill would establish an affirmative role for the Federal Government in helping those States which have previously required or permitted racially segregated public schools, and which must now develop programs of transition to desegregation. Such States established their school systems in good faith and in reliance upon earlier Supreme Court rulings that public school racial segregation was lawful, provided that separate but equal facilities were maintained. Now, in carrying out their duty to comply with the present ruling of the Court, these States and their communities are required to make adjustments which may impose temporary but serious financial and educational burdens on their existing school systems.

The bill would authorize appropriations for grants to States which required or permitted segregation in their public elementary and secondary schools as of May 17, 1954, the date of the first Supreme Court decision declaring such segregation to be unlawful. Funds appropriated would be allotted to the States proportionately according to their May 17, 1954, school population in segregated public school systems on that date. The bill would authorize appropriations only for the fiscal years 1960 and 1961. In January 1961, the Secretary would be required to report to Congress his recommendations as to the extension or modification of the legislation.

Federal grants would be available to pay half the costs borne by local educational agencies in providing the additional nonteaching professional services required by their desegregation programs. Included would be the services of supervisory or administrative personnel, pupil-placement officers, social workers and visiting teachers, and similar professional staff members needed to help resolve adjustment problems arising in the course of desegregation.

In addition, part of the State's allotment could be used to pay half of its expenditures at the State level for developing and carrying out State desegregation policies and programs, including the provision of technical assistance to local educational agencies.

To receive funds under this bill, a State would submit to the Commissioner of Education a plan setting forth its methods and criteria

for approving applications of local educational agencies, and describing the State-level activities for which the State would use grants. If in any year an approvable State plan is not filed, the Commissioner could, if the State consents or indicates it has no responsibility in the matter, make grants directly to local educational agencies in the State.

The draft bill would also authorize the Commissioner of Education to collect and disseminate information on the progress of public school desegregation, and, at the request of the States or local agencies, to provide technical assistance in the development of desegregation programs and to initiate or participate in conferences called to help resolve educational problems arising as a result of efforts to desegregate.

An enclosed summary explains in greater detail the provisions of the proposed program. Also enclosed is a statement of cost estimates and personnel requirements which would be entailed, as required by Public Law 801, 84th Congress.

### B. *Amendments to Public Laws 815 and 874, 81st Congress*

Public Laws 815 and 874, 81st Congress, authorize Federal payments to school districts which provide free public education to children whose parents reside or work on Federal property which is not subject to State or local taxation.

When the public schools in a federally affected area are closed as the result of State or local attempts to avoid compliance with Federal court decisions or decrees requiring desegregation, children of military personnel, like all other children in the community, are deprived of their education. The Federal Government has a particular responsibility for the large numbers of children of military personnel in such federally affected areas, since armed services personnel are located there under military orders rather than by their own free choice. Under the present law, the Commissioner of Education may provide for the education of children of military personnel only in the case of those who live on military reservations or other Federal properties.

The proposed bill would amend the present laws to enable the Commissioner and the armed services concerned to provide for the education of children of military personnel, regardless of where they live, when the public schools are closed to them. In such situations the Commissioner would also be authorized to make temporary provision for such school facilities as may be necessary for their education.

The bill would further authorize the Commissioner to acquire possession of any school building constructed with the aid of Federal funds after enactment of the proposed amendments, when the local educational agency which owns the building is no longer using it for free public education and the Commissioner needs the building to provide education to children of military personnel or to other children who reside on Federal property. While the school remains in Federal possession, the Commissioner would pay the local district a rental fee proportionate to its share in the cost of constructing the building.

No statement of estimated expenditures and man-years of civilian employment as described in Public Law 801, 84th Congress, is submitted with this proposal. The proposed new legislation would confer "standby" authority, and the number and nature of the situations, if any, which may occasion exercise of this authority cannot be pre-

16    CIVIL RIGHTS

dicted.  Also, any additional costs incurred under the bill would be wholly, or in large part, offset by reductions in payments to school districts under the two laws which would be realized in the situations to which the legislative proposal is addressed.

Enclosed is a summary explanation of the provisions of this draft bill.

I would appreciate it if you would refer both of the enclosed draft bills to the appropriate committee for consideration.

The Bureau of the Budget advises that enactment of this proposed legislation would be in accord with the program of the President.

Sincerely yours,

ARTHUR S. FLEMMING, *Secretary.*

DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

*Estimate of financial requirements for assistance for public school desegregation for fiscal years 1960 through 1964 in accordance with Public Law 801, 84th Cong.*

PROGRAM FUNDS

|  | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|
| New obligational authority | [1] $1,500,000 | $3,000,000 | 0 | 0 | 0 |
| Expenditures | 1,125,000 | 2,625,000 | 750,000 | 0 | 0 |

ADMINISTRATIVE EXPENSES

|  | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|
| Personal services | $90,000 | $142,500 | $75,000 | 0 | 0 |
| Other | 30,000 | 37,500 | 20,000 | 0 | 0 |
| Total new obligational authority | 120,000 | 180,000 | 95,000 | 0 | 0 |
| Expenditures | 110,000 | 175,000 | 110,000 | 0 | 0 |
| Man-years employment | 12 | 19 | 10 | 9 | 0 |

[1] Assumes allotments based on $3,000,000.

CHANGES IN EXISTING LAW

In compliance with clause 3 of rule XIII of the House of Representatives, there is printed below in roman existing law in which no change is proposed, with matter proposed to be stricken out enclosed in black brackets, and new matter proposed to be added shown in italics:

CIVIL RIGHTS                                             **17**

# TITLE 18, UNITED STATES CODE

## Chapter 73.—OBSTRUCTION OF JUSTICE

Sec.
1501. Assault on process server.
1502. Resistance to extradition agent.
1503. Influencing or injuring officer, juror or witness generally.
1504. Influencing juror by writing.
1505. Influencing or injuring witness before agencies and committees.
1506. Theft or alteration of record or process; false bail.
1507. Picketing or parading.
1508. Recording, listening to, or observing proceedings of grand or petit juries while deliberating or voting.
*1509. Obstruction of certain court orders.*

§ 1501. * * *
§ 1502. * * *
§ 1503. * * *
§ 1504. * * *
§ 1505. * * *
§ 1506. * * *
§ 1507. * * *
§ 1508. * * *

## § 1509. *Obstruction of certain court orders*

*Whoever corruptly, or by threats or force, or by any threatening letter or communication, willfully prevents, obstructs, impedes, or interferes with or willfully endeavors to prevent, obstruct, impede, or interfere with the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States which (1) directs that any person or class of persons shall be admitted to any public school, or (2) directs that any person or class of persons shall not be denied admission to any public school because of race or color, or (3) approves any plan of any State or local agency the effect of which is or will be to permit any person or class of persons to be admitted to any public school, shall be fined not more than $1,000 or imprisoned not more than sixty days, or both.*

*No injunctive or other civil relief against the conduct made criminal by this section shall be denied on the ground that such conduct is a crime; provided that any such fine or imprisonment imposed for violation of such injunction shall be concurrent with and not consecutive or supplemental to any criminal penalty imposed hereunder.*

*This section shall not apply to an act of a student, officer, or employee of a school if such act is done pursuant to the direction of, or is subject to disciplinary action by, an officer of such school.*

18                              CIVIL RIGHTS

# TITLE 18, UNITED STATES CODE

## Chapter 49.—FUGITIVES FROM JUSTICE

Sec.
1071. Concealing person from arrest.
1072. Concealing escaped prisoner.
1073. Flight to avoid prosecution or giving testimony.
*1074. Flight to avoid prosecution for damaging or destroying any building or other real or personal property.*

§ 1071. * * *
§ 1072. * * *
§ 1073. * * *

## § 1074. *Flight to avoid prosecution for damaging or destroying any building or other real or personal property*

*Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody, or confinement after conviction, under the laws of the place from which he flees, for willfully attempting to or damaging or destroying by fire or explosive any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center or educational institution, public or private, or (2) to avoid giving testimony in any criminal proceeding relating to any such offense shall be fined not more than $5,000 or imprisoned not more than five years, or both.*

*Violations of this section may be prosecuted in the Federal judicial district in which the original crime was alleged to have been committed or in which the person was held in custody or confinement: Provided, however, That this section shall not be construed as indicating an intent on the part of Congress to prevent any State, Territory, Commonwealth, or possession of the United States of any jurisdiction over any offense over which they would have jurisdiction in the absence of such section.*

———

# CIVIL RIGHTS ACT OF 1957

## PUBLIC LAW 85–315—SEPTEMBER 9, 1957

### (71 Stat. 634 et seq.)

PART I—ESTABLISHMENT OF THE COMMISSION ON CIVIL RIGHTS

SEC. 101. * * *

#### RULES OF PROCEDURE OF THE COMMISSION

SEC. 102. * * *

#### COMPENSATION OF MEMBERS OF THE COMMISSION

SEC. 103. * * *

#### DUTIES OF THE COMMISSION

SEC. 104. (a) The Commission shall—

(1) investigate allegations in writing under oath or affirmation that certain citizens of the United States are being deprived of their right to vote and have that vote counted by reason of their

color, race, religion, or national origin; which writing, under oath or affirmation, shall set forth the facts upon which such belief or beliefs are based;

(2) study and collect information concerning legal developments constituting a denial of equal protection of the laws under the Constitution; and

(3) appraise the laws and policies of the Federal Government with respect to equal protection of the laws under the Constitution.

[(b) The Commission shall submit interim reports to the President and to the Congress at such times as either the Commission or the President shall deem desirable, and shall submit to the President and to the Congress a final and comprehensive report of its activities, findings, and recommendations not later than two years from the date of the enactment of this Act.]

———

*(b) The Commission shall submit an interim report to the President and to the Congress not later than September 1, 1959, and at such other times as either the Commission or the President shall deem desirable. It shall submit to the President and to the Congress a final and comprehensive report of its activities, findings, and recommendations not later than four years from the date of enactment of this Act.*

(c) Sixty days after the submission of its final report and recommendations the Commission shall cease to exist.

———

## CIVIL RIGHTS ACT OF 1957

### PUBLIC LAW 85–315—SEPTEMBER 9, 1957

#### (71 Stat. 634 et seq.)

SEC. 105(a) There shall be a full-time staff director for the Commission who shall be appointed by the President by and with the advice and consent of the Senate and who shall receive compensation at a rate, to be fixed by the President, not in excess of $22,500 a year. The President shall consult with the Commission before submitting the nomination of any person for appointment to the position of staff director. Within the limitations of its appropriations, the Commission may appoint such other personnel as it deems advisable [in accordance with the civil service and classification laws,] *without regard to the provisions of the civil service laws and the Classification Act of 1949, as amended,* and may procure services as authorized by section 15 of the Act of August 2, 1946 (60 Stat. 810; 5 U.S.C. 55a), but at rates for individuals not in excess of $50 per diem.

(b) The Commission shall not accept or utilize services of voluntary or uncompensated personnel, and the term "whoever" as used in paragraph (g) of section 102 hereof shall be construed to mean a person whose services are compensated by the United States.

(c) The Commission may constitute such advisory committees within States composed of citizens of that State and may consult with governors, attorneys general, and other representatives of State

20    CIVIL RIGHTS

and local governments, and private organizations, as it deems advisable.

(d) Members of the Commission, and members of advisory committees constituted pursuant to subsection (c) of this section, shall be exempt from the operation of sections 281, 283, 284, 434, and 1914 of title 18 of the United States Code, and section 190 of the Revised Statutes (5 U.S.C. 99).

(e) All Federal agencies shall cooperate fully with the Commission to the end that it may effectively carry out its functions and duties.

(f) The Commission, or on the authorization of the Commission any subcommittee of two or more members, at least one of whom shall be of each major political party, may, for the purpose of carrying out the provisions of this Act, hold such hearings and act at such times and places as the Commission or such authorized subcommittee may deem advisable. Subpenas for the attendance and testimony of witnesses or the production of written or other matter may be issued in accordance with the rules of the Commission as contained in section 102 (j) and (k) of this Act, over the signature of the Chairman of the Commission or of such subcommittee, and may be served by any person designated by such Chairman.

(g) In case of contumacy or refusal to obey a subpena, any district court of the United States or the United States court of any Territory or possession, or the District Court of the United States for the District of Columbia, within the jurisdiction of which the inquiry is carried on or within the jurisdiction of which said person guilty of contumacy or refusal to obey is found or resides or transacts business, upon application by the Attorney General of the United States shall have jurisdiction to issue to such person an order requiring such person to appear before the Commission or a subcommittee thereof, there to produce evidence if so ordered, or there to give testimony touching the matter under investigation; and any failure to obey such order of the court may be punished by said court as a contempt thereof.

(h) *Without limiting the generality of the foregoing, each member of the Commission shall have the power and authority to administer oaths or take statements of witnesses under affirmation.*

———

## PUBLIC LAW 874, 81ST CONGRESS

### Act of September 30, 1950, as amended

AN ACT to provide financial assistance for local educational agencies in areas affected by Federal activities, and for other purposes.

\*        \*        \*        \*        \*        \*        \*

### CHILDREN FOR WHOM LOCAL AGENCIES ARE UNABLE TO PROVIDE EDUCATION

SEC. 6. (a) In the case of children who reside on Federal property—

(1) if no tax revenues of the State or any political subdivision thereof may be expended for the free public education of such children; or

(2) if it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children;

the Commissioner shall make such arrangements (other than arrangements with respect to the acquisition of land, the erection of facilities, interest, or debt service) as may be necessary to provide free public education for such children. *Such arrangements to provide free public education may also be made for children of members of the Armed Forces on active duty, if the schools in which free public education is usually provided for such children are made unavailable to them as a result of official action by State or local governmental authority and it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children.* To the maximum extent practicable, the local educational agency, or the head of the Federal department or agency, with which any arrangement is made under this section shall take such action as may be necessary to ensure that the education provided pursuant to such arrangement is comparable to free public education provided for children in comparable communities in the State, or, in the case of education provided under this section outside the continental United States, Alaska, and Hawaii, comparable to free public education provided for children in the District of Columbia. For the purpose of providing such comparable education, personnel may be employed without regard to the civil-service or classification laws. In any case where education was being provided on January 1, 1955, or thereafter under an arrangement made under this subsection for children residing on an Army, Navy (including the Marine Corps), or Air Force installation, it shall be presumed, for the purposes of this subsection, that no local educational agency is able to provide suitable free public education for the children residing on such installation, until the Commissioner and the Secretary of the military department concerned jointly determine, after consultation with the appropriate State educational agency, that a local educational agency is able to do so.

(b) In any case in which the Commissioner makes such arrangements for the provision of free public education in facilities situated on Federal property, he may also make arrangements for providing free public education in such facilities for children residing in any area adjacent to such property with a parent who, during some portion of the fiscal year in which such education is provided, was employed on such property, but only if the Commissioner determines after consultation with the appropriate State educational agency (1) that the provision of such education is appropriate to carry out the purposes of this Act, (2) that no local educational agency is able to provide suitable free public education for such children, and (3) in any case where in the judgment of the Commissioner the need for the provision of such education will not be temporary in duration, that the local educational agency of the school district in which such children reside, or the State educational agency, or both, will make reasonable tuition payments to the Commissioner for the education of such children. Such payments may be made either directly or through deductions from amounts to which the local educational agency is entitled under this Act, or both, as may be agreed upon between such agency and the Commissioner. Any amounts paid to the Commissioner by a State or local educational agency pursuant to this section shall be covered into the Treasury as miscellaneous receipts.

CIVIL RIGHTS

(c) In any case in which the Commissioner makes arrangements under this section for the provision of free public education in facilities situated on Federal property in Puerto Rico, Wake Island, Guam, or the Virgin Islands, he may also make arrangements for providing free public education in such facilities for children residing with a parent employed by the United States, but only if the Commissioner determines after consultation with the appropriate State educational agency (1) that the provision of such education is appropriate to carry out the purposes of this Act, and (2) that no local educational agency is able to provide suitable free public education for such children.

(d) The Commissioner may make an arrangement under this section only with a local educational agency or with the head of a Federal department or agency administering Federal property on which children reside who are to be provided education pursuant to such arrangement *or, in the case of children to whom the second sentence of subsection (a) applies, with the head of any Federal department or agency having jurisdiction over the parents of some or all of such children.* [Arrangements] *Except where the Commissioner makes arrangements pursuant to the second sentence of subsection (a), arrangements* may be made under this section only for the provision of education in facilities of a local educational agency or in facilities situated on Federal property.

(e) To the maximum extent practicable, the Commissioner shall limit the total payments made pursuant to any such arrangement for educating children within the continental United States, Alaska, or Hawaii, to an amount per pupil which will not exceed the per pupil cost of free public education provided for children in comparable communities in the State. The Commissioner shall limit the total payments made pursuant to any such arrangement for educating children outside the continental United States, Alaska, or Hawaii, to an amount per pupil which will not exceed the amount he determines to be necessary to provide education comparable to the free public education provided for children in the District of Columbia.

(f) In the administration of this section, the Commissioner shall not exercise any direction, supervision, or control over the personnel, curriculum, or program of instruction of any school or school system.

---

## PUBLIC LAW 815, 81ST CONGRESS

### Act of September 23, 1950, as amended

AN ACT relating to the construction of school facilities in areas affected by Federal activities, and for other purposes.

*       *       *       *       *       *       *

### APPLICATIONS

SEC. 6. (a) No payment may be made to any local educational agency under this Act except upon application therefor which is submitted through the appropriate State educational agency and is filed with the Commissioner in accordance with regulations prescribed by him.

(b) (1) Each application by a local educational agency shall set forth the project for the construction of school facilities for such agency with respect to which it is filed, and shall contain or be supported by—

(A) a description of the project and the site therefor, preliminary drawings of the school facilities to be constructed thereon, and such other information relating to the project as may reasonably be required by the Commissioner;

(B) assurance that such agency has or will have title to the site, or the right to construct upon such site school facilities as specified in the application and to maintain such school facilities on such site for a period of not less than twenty years after the completion of the construction;

(C) assurance that such agency has legal authority to undertake the construction of the project and to finance any non-Federal share of the cost thereof as proposed, and assurance that adequate funds to defray any such non-Federal share will be available when needed;

(D) assurance that such agency will cause work on the project to be commenced within a reasonable time and prosecuted to completion with reasonable diligence;

(E) assurance that the rates of pay for laborers and mechanics engaged in the construction will be not less than the prevailing local wage rates for similar work as determined in accordance with Public Law Numbered 403 of the Seventy-fourth Congress, approved August 30, 1935, as amended;

(F) assurance that the school facilities of such agency will be available to the children for whose education contributions are provided in this Act on the same terms, in accordance with the laws of the State in which the school district of such agency is situated, as they are available to other children in such school district; [and]

(G) assurance that such agency will from time to time prior to the completion of the project submit such reports relating to the project as the Commissioner may reasonably require[.]; *and*

(H) *assurance that such agency will make the school facilities included in any such project, the application for which is approved after enactment of this clause, available to the Commissioner pursuant to section 10(b).*

(2) The Commissioner shall approve any application if he finds (A) that the requirements of paragraph (1) have been met and that approval of the project would not result in payments in excess of those permitted by sections 4 and 5, (B) after consultation with the State and local educational agencies, that the project is not inconsistent with overall State plans for the construction of school facilities, and (C) that there are sufficient Federal funds available to pay the Federal share of the cost of such project and of all other projects for which Federal funds have not already been obligated and applications for which, under section 3, have a higher priority: *Provided*, That the Commissioner may approve any application for payments under this Act at any time after it is filed and before any priority is established with respect thereto under section 3 if he determines that—

(i) on the basis of information in his possession, it is likely that the urgency of the need of the local educational agency is

24                                    CIVIL RIGHTS

such that it would have a priority under section 3 which would qualify it for payments under this Act when such priorities are established, and

(ii) the number of children in the increase under section 5(a) is in large measure attributable to children who reside or will reside in housing newly constructed on Federal property.

(c) No application under this Act shall be disapproved in whole or in part until the Commissioner of Education has afforded the local educational agency reasonable notice and opportunity for hearing.

＊        ＊        ＊        ＊        ＊        ＊        ＊

CHILDREN FOR WHOM LOCAL AGENCIES ARE UNABLE TO PROVIDE
EDUCATION

SEC. 10. (a) In the case of children who it is estimated by the Commissioner in any fiscal year will reside on Federal property at the end of the next fiscal year—

(1) if no tax revenues of the State or any political subdivision thereof may be expended for the free public education of such children; or

(2) if it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children,

the Commissioner shall make arrangements for constructing or otherwise providing the minimum school facilities necessary for the education of such children. *Such arrangements may also be made to provide on a temporary basis, minimum school facilities for children of members of the Armed Forces on active duty, if the schools in which free public education is usually provided for such children are made unavailable to them as a result of official action by State or local governmental authority and it is the judgment of the Commissioner, after he has consulted with the appropriate State educational agency, that no local educational agency is able to provide suitable free public education for such children.* To the maximum extent practicable school facilities provided under this section shall be comparable to minimum school facilities provided for children in comparable communities in the State. This section shall not apply (A) to children who reside on Federal property under the control of the Atomic Energy Commission, and (B) to Indian children attending federally operated Indian schools. Whenever it is necessary for the Commissioner to provide school facilities for children residing on Federal property under this section, the membership of such children may not be included in computing under section 5 the maximum on the total of the payments for any local educational agency.

(b) *Whenever the Commissioner determines that—*

(1) *any school facilities with respect to which payments were made under section 7 of this Act, pursuant to an application approved under section 6 after the enactment of this subsection, are not being used by a local educational agency for the provision of free public education, and*

(2) *such facilities are needed in the provision of minimum facilities under subsection (a),*

*he shall notify such agency of such determination and shall thereupon be entitled to possession of such facilities for purposes of subsection (a), on*

*such terms and conditions as may be prescribed in regulations of the Commissioner. Such regulations shall include provision for payment of rental in an amount which bears the same relationship to what, in the judgment of the Commissioner, is a reasonable rental for such facilities as the non-Federal share of the cost of construction of such facilities bore to the total cost of construction thereof (including the cost of land and off-site improvements), adjusted to take into consideration the depreciation in the value of the facilities and such other factors as the Commissioner deems relevant. Upon application by the local educational agency for the school district in which such facilities are situated and determined by the Commissioner that such agency is able and willing to provide suitable free public education for the children in the school district of such agency to whom section 10 is applicable, or upon determination by the Commissioner that such facilities are no longer needed for purposes of subsection (a), possession of the facilities shall be returned to such agency. Such return shall be effected at such time as, in the judgment of the Commissioner, will be in the best interest of the children who are receiving free public education in such facilities, and in the light of the objectives of this Act and the commitments made to personnel employed in connection with operation of such facilities pursuant to arrangements made by the Commissioner.*

\*        \*        \*        \*        \*        \*        \*

## ADDITIONAL VIEWS

No subject before this Congress is of greater importance than the civil rights bill which is the subject of this report. The need for full understanding of what this legislation does, and does not, do, has led us to state these additional views. We fully subscribe to the majority report; but we also feel that this bill could have provided, and ought to provide, an even firmer basis for Federal efforts to obtain equal protection of the laws. The problem is national in scope. If denials of equal protection of the laws occur in one local community, the fiber of our national community is weakened.

The bill is a moderate, balanced approach to several of the most urgent civil rights problems.

Title I makes it a misdemeanor—not a felony—to obstruct court orders.

Title II will permit Federal authorities to assist in the apprehension of those who have willfully bombed or destroyed by fire any building or other real or personal property, or who flees to avoid testifying in criminal proceedings relating to such acts. Introduced into the hearings was a chart of the bombings and attempted bombings of recent years. The chart shows close to 100 such incidents, in every area of the United States.

Title III is a necessary supplement to part IV of the Civil Rights Act of 1957, which prohibits threats or intimidation designed to prevent persons from exercising their right to vote. The new proposal would implement Federal enforcement of this protection by requiring State elections officials to retain for 2 years voting and registration records for all Federal elections, and to make them available for examination by the U.S. Attorney General.

Title IV of the bill would extend the life of the Civil Rights Commission, scheduled presently to expire next month, until September 1961. The need for full-time study and investigation of alleged denials of equal protection of the laws in every corner of the country has been demonstrated. We approve of the strict impartiality and reasonable approach of the Commission, which has conducted significant investigations in both North and South. Its services are still needed.

The final title (title V) of the bill is based upon the need to prevent children of Armed Forces personnel stationed in communities which have closed their public schools from being made the innocent victims of such actions. Present laws relating to children of servicemen stationed on bases would be broadened to make provision for all children of servicemen, whether or not living on bases, if public schools which they normally attend are closed down by State or local authorities.

Hon. Arthur S. Flemming, Secretary of the Department of Health, Education, and Welfare, has testified that there are approximately 70,000 such children living in the 6 States which, by reason of their laws, may close their public schools.

26

The foregoing is what the bill does. As far as it goes, it is good. But it is a bare minimum. Here is what it does not do:

The original bill reported out by the subcommittee contained three titles which did not survive the full-committee deliberation. The most important, in our opinion, was title VIII, the so-called technical-assistance provision. It represented a sensible, fair, and effective approach to the problems that may accompany the initial stages of school desegregation. It is a recognition of Government responsibility to share in the solution of such problems. The best description of this provision was provided by Secretary Flemming in his letter of February 5, 1959, to the Congress, forwarding the legislative proposal:

*A. Grants and technical assistance*

The first draft bill would establish an affirmative role for the Federal Government in helping those States which have previously required or permitted racially segregated public schools, and which must now develop programs of transition to desegregation. Such States established their school systems in good faith and in reliance upon earlier Supreme Court rulings that public school racial segregation was lawful, provided that separate but equal facilities were maintained. Now, in carrying out their duty to comply with the present ruling of the Court, these States and their communities are required to make adjustments which may impose temporary but serious financial and educational burdens on their existing school systems.

The bill would authorize appropriations for grants to States which required or permitted segregation in their public elementary and secondary schools as of May 17, 1954, the date of the first Supreme Court decision declaring such segregation to be unlawful. Funds appropriated would be allotted to the States proportionately according to their May 17, 1954, school population in segregated public school systems on that date. The bill would authorize appropriations only for the fiscal years 1960 and 1961. In January 1961, the Secretary would be required to report to Congress his recommendations as to the extension or modification of the legislation.

Federal grants would be available to pay half the costs borne by local educational agencies in providing the additional nonteaching professional services required by their desegregation programs. Included would be the services of supervisory or administrative personnel, pupil-placement officers, social workers and visiting teachers, and similar professional staff members needed to help resolve adjustment problems arising in the course of desegregation.

In addition, part of the State's allotment could be used to pay half of its expenditures at the State level for developing and carrying out State desegregation policies and programs, including the provision of technical assistance to local educational agencies.

To receive funds under this bill, a State would submit to the Commissioner of Education a plan setting forth its methods and criteria for approving applications of local

educational agencies, and describing the State-level activities
for which the State would use grants. · If in any year an
approvable State plan is not filed, the Commissioner could,
if the State consents or indicates it has no responsibility in
the matter, make grants directly to local educational agencies
in the State.

The draft bill would also authorize the Commissioner of
Education to collect and disseminate information on the prog-
ress of public school desegregation, and, at the request of
the States or local agencies, to provide technical assistance
in the development of desegregation programs and to initiate
or participate in conferences called to help resolve educational
problems arising as a result of efforts to desegregate.

We believe this measure to be of tremendous importance and we
will support its restoration to the bill on the floor of the House.

The original bill, as reported to the full committee, contained a
title (title III) which would have authorized the Attorney General (a)
to initiate civil injunctive proceedings against individuals depriving a
person of the equal protection of the law by reason of race, color,
religion, or national origin, upon the Attorney General's receiving a
complaint from such person so alleging and upon the Attorney
General's certifying the inability of such person to obtain legal pro-
tection himself; (b) to seek civil injunctive relief against persons
hindering Federal or State officials from according equal protection
of the laws or from carrying out court orders; and (c) to seek civil
injunctive relief, on complaint received, against individuals endeavor-
ing under color of State authority to deprive persons of rights guaran-
teed by the 14th amendment. Civil action thus instituted could be
brought in U.S. district courts, without abiding the exhaustion of
State or administrative remedies.

The Attorney General and the administration recommended such a
measure in 1957. The Judiciary Committee did likewise. We see no
reason not to do so in 1959. The reasons for title III were well said
by the Attorney General of the United States in 1957, as follows:

In such a civil proceeding the facts can be determined, the
rights of the parties adjudicated, and future violations of the
law prevented by order of the court without having to sub-
ject State officials to the indignity, hazards, and personal
expense of a criminal prosecution in the courts of the United
States. * * *  At the present time section 1985 of title 42,
United States Code, authorizes civil suits by private persons
who are injured by acts done in furtherance of a conspiracy
to prevent officers from performing their duties, to obstruct
justice, or to deprive persons of their rights to equal protec-
tion of the laws and equal privileges under the laws.

So we think that a subsection could be added to that
statute which would give authority to the Attorney General
to institute a civil action for preventive relief whenever any
person is engaged or about to engage in acts or practices
which would give rise to a cause of action under the present
provisions of the law.

I think it would be simpler, I think it would be more flex-
ible, and I think it would be more reasonable, and I think it

would be more effective than the criminal sanctions which are the only remedy now available.

We think the same reasoning applies now.

Finally, the original bill also contained a title VI, which would have given legislative sanction to the President's Committee on Government Contracts. This committee, under Executive sanction, polices Government contracting practices to promote the elimination of discrimination in employment based on race, creed, color, or national origin in the performance of Government contracts or subcontracts. The Secretary of Labor, Hon. James P. Mitchell, said this at the hearings:

> * * * if a Commission of this type is to do its job fully and effectively, its basis in law should be clear and unequivocal. If the task of Government to advance equal job opportunities is worth doing, it is worth doing right, and it is worth doing with the full weight of Congress behind it. An agency of this kind should be strengthened with congressional approval (hearings, p. 322, Mar. 12, 1959).

We concur with his sentiment. The measure should be restored.

JOHN V. LINDSAY.
WILLIAM T. CAHILL.

## ADDITIONAL VIEWS

Although there are differences of opinion among the members of the House Judiciary Committee as to what, if any, civil rights legislation is necessary, it is my opinion that H.R. 8601 as reported by the House Judiciary Committee, is good legislation *with one exception.* The exception to which I strenuously object is the committee amendment to title II.

Title II as originally considered by the committee, added a new section under the Federal unlawful flight to avoid prosecution statute. Under existing law, title 18, section 1073, permits the Federal Government to investigate and apprehend individuals who travel in interstate and foreign commerce with the intent either (1) to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which he flees, for murder, kidnaping, burglary, robbery, mayhem, rape, assault with a deadly weapon, arson punishable as a felony, or extortion accompanied by threats of violence, or attempt to commit any of the foregoing offenses, or (2) to avoid giving testimony in any criminal proceedings in such place in which the commission of an offense punishable by imprisonment in a penitentiary is charged.   The penalty is not more than $5,000 or imprisonment not more than 5 years, or both.

The original bill added a new section listing an additional crime under the unlawful flight statute, to wit, willfully damaging or destroying or attempting to damage or destroy by fire or explosives any building, structure, facility, or vehicle if such building, structure, facility, or vehicle is *used primarily for religious purposes or for the purposes of public or private, primary, secondary or higher education.*

The committee amended these proposed provisions of title II so that it now reads as follows:

> for willfully attempting to or damaging or destroying by fire or explosives any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center or educational institution, public or private.

The bill as amended is too broad since it would cover any attempts to damage or destroy any structure or vehicle or actual damage or destruction to any such structure or vehicle by fire or explosive. Among the unlimited items covered under the amendment would be motels, hotels, theaters, restaurants, stores, barns and homes and automobiles of labor leaders, hoodlums and gamblers.   There are thousands of such incidents occurring throughout the United States annually.   These are strictly local offenses and should be handled as such.

Although the amended bill does not presume interstate flight, the language is broad enough for the supporters of such legislation to expect the Federal Government to enter every case to determine whether or not a Federal offense has occurred.   The bill does not permit discretion and individuals could demand the Federal Govern-

CIVIL RIGHTS                                        **31**

ment to initiate investigation in incidents which are strictly local offenses. In this connection it is noted that the Department of Justice in discussing the administration's proposal, which would penalize interstate flight to avoid prosecution for the destruction of religious or educational facilities, had stated that such bill would not necessarily presume such flight but that the FBI would be justified in conducting immediate investigation to determine if a Federal offense existed. The supporters of the amended bill would use such an expression in demanding Federal investigation whenever any building, dwelling, structure, or vehicle, such as a liquor store or barn, or a truck or an automobile in strike areas, was destroyed by fire or explosives.

The primary responsibility for the protection of life and property rests, of course, with State and local authorities. They are, in the final analysis, the Nation's first line of defense against crime which is essentially a local problem and one which can best be analyzed and met on the community level. Legislation drawing the Federal Government into a wide variety of local criminal violations could tend to relieve local authorities of their primary responsibility in such matters. If local authorities do not maintain the authority and legal obligation to secure the peace, they cannot be expected to accept the responsibility. They could develop undue dependence upon Federal authorities, particularly in controversial and tense matters such as labor disputes, contested local elections, local gang wars, etc., causing an end result of increased Federal police powers and a decrease in the willingness of local authorities to assume the primary responsibility that is rightfully theirs.

In testifying before Subcommittee No. 5 of the Committee on the Judiciary of the House of Representatives, the Attorney General in presenting the administration's program pointed out that the purpose of such a bill was to provide a Federal deterrent to the bombing of schools and places of worship which was the type of outrage that shocked all decent people. He pointed out that such incidents presented important problems in the national as well as the local level inasmuch as racial and religious intolerance are of extremely serious national and international concern. The amended bill going far beyond educational and religious buildings and facilities would extend jurisdiction of the Federal Government into matters that are entirely the concern of only the local community.

It is my opinion that title II of the reported bill should be amended so that this additional crime under the unlawful flight statute is tied down to religious and educational purposes. To do so the words *"used primarily for the purpose of a"* should be inserted between "dwelling house and synagogue." This will make the language read—

> \* \* \* for willfully attempting to or damaging or destroying by fire or explosives any building, structure, facility, vehicle, dwelling house, *used primarily for the purpose of a* synagogue, church, religious center, or educational institution, public or private.

H. ALLEN SMITH.

## MINORITY VIEWS ON H.R. 8601

Since the 84th Congress, when the so-called civil rights legislation came under active consideration by the House Judiciary Committee and the House of Representatives, the opponents of this legislation have unanimously expressed the opinion that the more the legislation was subjected to analysis and scrutiny, the more the imperfections became evident. The experience of the 85th Congress itself during the consideration of the Civil Rights Act of 1957 corroborates that position. Now, in the 86th Congress, the same conclusion is true.

Of the many bills which were originally introduced on the subject, all have been abandoned by the Judiciary Committee except the one now under consideration, H.R. 8601. This bill, however, is the result of radical amendment. The deliberations of both the subcommittee and the full Judiciary Committee have resulted in major and substantial changes.

In its consideration of the original bill, H.R. 3147, the subcommittee struck out all of its provisions and substituted its own version, a version vastly different from that contained in the bill as introduced. The version of the subcommittee provided for such subjects as obstruction of court orders, flight to avoid prosecution for damaging or destroying buildings used primarily for educational or religious purposes, authorizations of the Attorney General to institute civil proceedings to provide equal protection of the laws or to prevent discriminati·n, to prevent deprivation of civil rights in general, an extension of the Civil Rights Commission for 2 years, a statutory Commission for Equal Job Opportunities under Government Contracts, educati·n of children of the members of the Armed Forces, grants to assist State and local educational agencies to effectuate desegregation, and finally preservation of Federal election records.

The full committee, in its consideration and deliberation of these proposals, brought to light each and every facet of both the factual and legal ramifications of each proposal. The action of the full committee substantiates the position of the opponents of this legislation that many of the proposals were unwarranted, unnecessary, and would totally fail to achieve the objectives which the proponents maintained was the purpose of the legislation. The discussion in the full committee raised serious questions as to the constitutionality of many of these proposals; it brought to the surface the latent but dangerous implications and ramifications of the legislation. As a result, the full committee partially sustained the position of the opponents of this legislation by adopting the following amendments: The broadening of title II of the bill so as to include flights from prosecution for the destruction and damaging of all property, both real and personal; the deletion in its entirety of the provision authorizing the Attorney General to bring civil actions—the so-called title III as proposed originally in the 85th Congress; the elimination of the entire provision creating a Commission on Equal Job Opportunity Under Government Contracts and the complete deletion of the provision for grants to assist State and local educational agencies to effectuate desegregation.

82

In addition to these major changes, the full committee, by amendments, attempted to refine and perfect those titles which are contained in the bill H.R. 8601. These amendments were many and varied. For instance, title I—obstruction of court orders—was amended so as to limit its application only to court orders affecting a public school; the crime itself was changed from a felony to a misdemeanor by a reduction in the punishment and provision was made to prohibit and prevent consecutive sentencing. As for title III—Federal election records—the retention period was reduced from 3 to 2 years, the penalty for violation of the section was reduced so as to be consistent in both instances, the demand of the Attorney General was circumscribed so as to make it more definite and certain, thus preventing any abuse, and finally, protection against unwarranted disclosure of the records was amended so as to permit reproduction for the Congress or any of its committees and other governmental agencies.

Title IV, extending the Civil Rights Commission for 2 years, was amended so as to permit members to administer oaths and also waived the existing requirement that its personnel be employed under civil service and classification laws.

Even though the action of the full committee can be categorized as one of refinement and improvement on the legislation, it should not be construed as even the slightest indicia of approval of the bill on the part of the undersigned. Our opposition and disapproval of this bill would never be overcome by any amendment. Our fundamental principle is that this legislation with all of its ramifications, is fundamentally wrong and can never be made right. The legislation is bad in principle and any mitigation of the evil still leaves the quintessence of evil. We point out this legislative history as indicative and demonstrative of our warnings, our fears, and our arguments which we have promulgated in the past, which have been proven by experience and which caution as to future dangers involved in this proposal.

The proponents of this legislation, who supported the Civil Rights Act of 1957 cannot deny the serious effects which that law has had upon this Nation. The warnings which we sounded during the debate in the 85th Congress on that legislation have unfortunately come to pass. The best interests of our Nation have not been served by that law.

No better proof of this can be found than in the position now taken by the President and the Attorney General in the abandonment today of the position both advocated in 1957, namely, the authorization for the Attorney General to institute civil proceedings for the protection of civil rights. Fortunately, that provision was eliminated from the Civil Rights Act of 1957 and today as a result of experience, it is no longer desired by the President or the Attorney General. Yet some of the proponents of civil rights legislation still seek that provision which, as we have said, has been rejected by the Judiciary Committee.

Unfortunately, however, there has been a reversal in the position of the administration in another aspect from that which it took in 1957. The then Attorney General, Mr. Brownell, in his executive communication to the Speaker dated April 9, 1956, on civil rights, stated:

> In this area, as pointed out more fully below, more emphasis should be placed on civil law remedies. Civil rights enforcement activities of the Department of Justice should not therefore be confined to the Criminal Division. * * * The present laws affecting the right of franchise were con-

CIVIL RIGHTS

ceived in another era. Today, every interference with this right should not necessarily be treated as a crime. Yet the only method of enforcing existing laws protecting this right is through criminal proceedings.

Civil remedies have not been available to the Attorney General in this field. We think that they should be. Criminal cases in a field charged with emotion are extraordinarily difficult for all concerned. Our ultimate goal is the safeguarding of the free exercise of the voting right, subject to the legitimate power of the State to prescribe necessary and fair voting qualifications. To this end, civil proceedings to forestall denials of the right may often be far more effective in the long run than harsh criminal proceedings to punish after the event.

In the light of that statement, attention is invited to the current proposal of both the President and his Attorney General. The Attorney General, in supplementing the President's message on civil rights, sent an executive communication to the Speaker, dated February 5, 1959, recommending four legislative proposals. Three of these legislative proposals involve criminal prosecution. This is a complete reversal of position from that taken 2 years ago. In the detailed analysis of the various sections, the ramifications of this reversal of position will be set forth.

It is our conviction that an objective approach, buttressed by the facts and substantiated by law, will warrant the support of the majority of the Members of the House to reject this proposal on its merits. If the United States is to maintain its position in the world as the leader of the free nations, it must first set its own house in order. This H.R. 8601 will not do. Just as the Civil Rights Act of 1957 was divisive in its effect on our peoples, this proposal will only accentuate and exacerbate the wounds and the scars inflicted upon a free people by ill-conceived, imperfectly drafted, and constitutionally unsound legislation which this bill is, beyond a question of a doubt.

### TITLE I—OBSTRUCTION OF COURT ORDERS

The bill proposes to amend the Criminal Code with respect to the obstruction of court orders in school desegregation cases. The measure would make it a Federal offense willfully to use force or threats of force to obstruct court orders in school desegregation cases. The original version made this offense a felony, with punishment up to a fine of $10,000 or imprisonment of not more than 2 years, or both. However, as previously noted, this bill, H.R. 8601, reduces the punishment to a fine of not more than $1,000 or imprisonment of not more than 60 days, or both, thus changing the crime from a felony to a misdemeanor. The language of this title is of a doubtful constitutionality. It may be violative of the right to freedom of speech under the first amendment of the Constitution and in addition, as a penal statute, it may fall because the language is vague and indefinite. The language—

Whoever corruptly, or by threats or force, or by any threatening letter or communication, willfully prevents, obstructs, impedes, or interferes with or willfully endeavors to prevent, obstruct, impede, or interfere with the due exercise of rights

or the performance of duties under any order, judgment, or decree of a court of the United States which—

(the reference here being to school desegregation orders) fails to properly inform an individual of just what act or action constitutes a violation of this section, and is broad and sweeping.

That language, moreover, interferes with freedom of speech and in this particular field is fraught with danger. In the history of this Nation, no court decision has been more widely discussed, argued, disagreed with throughout the length and breadth of this land than the decisions of our Federal courts involving school desegregation cases. It is our contention that this language would encompass honest discussion as to the merits or demerits of such an order. It can possibly reach out to editorial comment which might oppose integration under a court order of this type.

In addition to our initial objection, there are several other specific objections to the language contained in this title. The use of the word "endeavor" is a very interesting one, and is one which should be carefully understood. Ordinarily in a criminal statute, there is set forth a definition of the substantive crime or an attempt to commit that crime. The word "attempt" in criminal jurisprudence is a very significant one. Normally "attempt" means some act beyond mere preparation and will amount to the commencement of the consummation of the crime. It should be noted that this language does not use the word "attempt" but rather the word "endeavor." In the case of *U.S.* v. *Russell* (255 U.S. 138), at page 143 the Court said: "We think, however, that neither the contention nor the cases are pertinent to the section under review and upon which the indictment was based. The word of the section" (referring to the obstruction-of-justice section of the Criminal Code) "is 'endeavor,' and by using it the section got rid of the technicalities which might be urged as besetting the word 'attempt,' and it describes any effort or essay to accomplish the evil purpose that the section was enacted to prevent." Thus, by the use of the word "endeavor" instead of the word "attempt" the prosecution has a lesser degree of the burden of proving guilt than it would have if the word "attempt" had been used.

A striking feature of this particular title is the designation to cover only school desegregation orders and not any other type. According to the Attorney General, the need for this particular designation is exemplified by the occurrence at Little Rock in 1957 and the alleged concomitant mob action there. On the other hand, no other justification is given nor is there any justification afforded for giving preferential treatment to court orders in school desegregation cases over the many other types of Federal court orders issued. From day to day throughout the United States, court orders of every type and description are issued. In the case of court orders involving labor disputes, violation of the orders more often than not are accomplished by violence. Yet this particular type of order is not included. The selection of the court order in school desegregation cases is unprecedented. No other type of court order has ever been singled out so as to make a violation of it a Federal crime.

One of the reasons advanced for this selective treatment is that the use of contempt of court in cases of mob action would not necessarily involve the leaders of the mob, whereas the enactment of this proposal would permit a criminal prosecution. Here it should be noted

CIVIL RIGHTS

that it would be possible for one who is named in the order to be subject to more than one prosecution for a single act. If the act of such a party violated the court order, he would be subject to criminal contempt of court and, parenthetically here, not entitled to a jury trial. Also, he could possibly be subject to prosecution for a violation of the obstruction of justice statute, title 18, United States Code, section 1503, for corruptly or by threats or force, obstructing or impeding the due administration of justice and at the same time be subject to a prosecution for violating this new section. It is also a possibility that he would be further subject to a criminal prosecution for a violation of a State penal law since most of the acts which would constitute a violation of this section would at the same time be violative of State criminal law.

It is possible at the present time to deal with the situation of mob violence as has been done in the past in school desegregation cases by returning to a court and obtaining an order against those who are acting to impede or obstruct the order. From there on any subsequent act in violation of the order would constitute contempt. The Attorney General has referred to this procedure as being time consuming and as being of no practical use in producing prompt action to disperse the mob.

The present obstruction-of-justice statute has been referred to by the proponents of this legislation as being inadequate to cope with the specific situation involved in school desegregation orders. However, the Attorney General stated during the course of the hearings that while it was true that the phrase "due administration of justice" as used in the existing law has been subjected to narrow interpretation, he could not state categorically that a desegregation decree is necessarily beyond the reach of the existing obstruction-of-justice statute. That conclusion is a sound one because interference with an existing order clearly relates to a case that is pending and thus disturbs the ordinary and proper functions of the court within the meaning of the statute.

In passing on this particular title, it should also be noted that the enactment into law of this new section of the Penal Code would authorize Federal authorities to make an arrest on the spot for an act violative of this section.

Included in this proposed new criminal section is a provision that no injunctive or other civil relief against conduct made criminal by this new section shall be denied on the grounds that such conduct is a crime. There appears to be no apparent reason for the insertion of this particular language unless it is the intent to use the acts constituting an offense under new language proposed as the basis for securing a court order prohibiting subsequent violative acts. Thus arises the possibility of citation for contempt of such an order for subsequent violative acts. Stated another way, a man could be convicted for violating the proposed new section, then a court order enjoining him obtained, and any act thereafter violating the order would then subject him not only to a new prosecution for violating the proposed section again but also a criminal contempt citation for violating the order. It was for that very reason that amendment was proposed to this particular provision so that any fine or imprisonment proposed for violating such injunction could not be consecutive

or supplemental to any punishment imposed for violating this particular criminal provision.

We believe that this title should be stricken from the bill for the reasons which we have stated. Its possible infringement on constitutional rights, its invitation to multiple criminal prosecutions for the same act, its vagueness and generality is repugnant to our basic tenets and principles of American criminal jurisprudence. The need for it has never been justified but the danger of it upon enactment is proven.

### TITLE II—FLIGHT TO AVOID PROSECUTION FOR DAMAGING OR DESTROYING ANY BUILDING OR OTHER REAL OR PERSONAL PROPERTY

This title would amend the Criminal Code so as to make it a felony, punishable by a fine of not more than $5,000 or imprisonment not more than 5 years, or both, to move in interstate or foreign commerce to avoid local prosecution, custody or confinement after conviction, for willfully damaging or destroying or attempting to damage or destroy, by fire or explosive any building, structure, facility, vehicle, dwelling house, synagogue, church, religious center, or educational institution, public or private. Flight to avoid testifying in criminal proceedings relating to such offense would likewise be punished.

This particular title does not belong in the bill H.R. 8601. It in no way deals with the subject matter of the bill; namely, constitutional and civil rights. The testimony adduced during the course of the hearings on this proposal, even as it was originally introduced in the version which limited it in scope to destruction of buildings used primarily for educational or religious purposes, justifies its exclusion in view of the overall alleged purpose of the bill; namely, the enforcement of constitutional rights. It is not relevant to that subject matter.

However, being confronted with a civil rights bill which contained a provision amending the Fugitive Felon Act, but limited in its application to the bombing of religious and educational institutions, we deemed it right and proper to amend this title of the bill so as to make it embrace the bombing of any type of property, real or personal.

### TITLE III—FEDERAL ELECTION RECORDS

This title requires all records of elections preserved for 2 years from the date of any election in which candidates for the office of President, Vice President, presidential elector, Member of Congress, Resident Commissioner are voted for, all records and papers relating to any application, registration, payment of poll tax, or other act requisite to voting in such an election, under penalty of fine or imprisonment. These records are to be made available to the Attorney General for inspection, reproduction and copying on demand, which would be in writing, setting forth the basis and purpose thereof. Jurisdiction is conferred on the U.S. district courts to compel the production of such records. The term "election" would include a general, special, or primary election for the specified Federal officers. The willful failure to comply carries a punishment of a fine of not more than $1,000 or of imprisonment for not more than 1 year, or both, and the same

Exhibit 6, Page 37 of 42

penalty is provided for one who willfully steals, destroys, conceals, mutilates, or alters such record required to be retained or preserved.

Here again is another instance of the reversal of the position of the Department of Justice between 1957 and 1959 as outlined earlier in these minority views. In 1957, while testifying before the Senate Subcommittee on Constitutional Rights in support of legislation in the field of civil rights, Mr. Brownell stated:

> The major defect in the statutory picture, however, has been the failure of Congress thus far to authorize specifically the Attorney General to invoke civil powers and remedies. Criminal prosecutions, of course, cannot be instituted until after the harm has been actually done, yer no amount of criminal punishment can rectify the harm which the national interest suffers when citizens are illegally kept from the polls. Furthermore, criminal prosecutions are often unduly harsh in this peculiar field where the violators may be respected local officials. What is needed, and what the legislation sponsored by the administration would authorize, is to lodge power in the Department of Justice to proceed in civil suits in which the problem can often be solved in advance of the election and without the necessity of imposing upon any official the stigma of criminal prosecution.

The substance of title III is absolutely contradictory to the position taken by Mr. Brownell in 1957. This proposal imposes on both State and local officials a Federal statutory responsibility, a violation of which is made a Federal criminal offense. No need, no justification for such a reversal of position has been given. The enactment of the Civil Rights Act of 1957 provided the Attorney General with the authority to prevent by civil litigation the deprivation of the right to vote. Today the Attorney General seeks to bolster that authority through the medium of the proposed title III. The entire title is subject to doubt as to its constitutionality from the standpoint of the authority of Congress to enact such legislation in the field of Federal elections.

The power of Congress with respect to the election of Members of the House of Representatives is on a basis different from that applicable to elections of presidential electors, State, county, or city officers and possibly even U.S. Senators. The powers of Congress over elections are delineated in article I, section 4, article II, section 1, and the 17th amendment.

Article I, section 4, permits Congress to make or alter regulations as to the times, places, and manner of holding elections for Senators and Representatives. It is our position that the language proposed in title III of H.R. 8601 has no relationship or bearing on either the time or place or manner of holding an election and is not, therefore, within that enumerated power of the Congress.

The 17th amendment governing the election of Senators merely provides for the qualification of electors or voters in any election for a U.S. Senator. That amendment cannot be construed as a source of authority for the enactment of the language proposed in title III of the bill.

There is no power in Congress as to the election of its Members which would authorize it to impose new duties or obligations upon a

State, county, or municipal officer acting under State laws in the registering of voters, or in conducting the time, place, or manner of holding the election.

Congress, moreover, cannot assume full control of all elections at which congressional representatives are chosen in conjunction with State and county officers (*Ex parte Perkins*, 29 Fed. 900).

The power of Congress over the selection of presidential electors is even more limited (art. II, sec. 1, Constitution). Congress may not interfere with the method designated by the State legislature for the appointment of presidential electors. For these presidential electors are State officers and not Federal officers (*In re Green*, 134 U.S. 377, *Walker* v. *United States*, 93 F. 2d 383, certiorari denied, 303 U.S. 644).

Congress, therefore, has no power over presidential elections or electors except to determine the time of choosing the electors and the day upon which they cast their votes. The power of the States in choosing presidential electors is exclusive (*McPherson* v. *Blacker*, 146 U.S. 1).

Indeed, if the source of congressional authority to enact this title pivots on the 15th amendment, then it must be noted that the 15th amendment is applicable not only to the Federal Government but also to the States. While title III purports to be restricted to Federal officers only, in view of the provisions of the 15th amendment, this language would be applicable to State elections as well. Never before has the Congress been asked to enact such a proposal. Therefore, not only because of the doubtful constitutionality of this proposal but the unwarranted, unprecedented intrusion of Federal authority into purely State and local elections demands the rejection of this title. Another latent defect of this title is that in effect the enactment of title III would hand to the Attorney General of the United States unlimited power of discovery. Congress in the past has rejected requests to provide the Attorney General of the United States with the power of subpena. Here, however, he would be provided with even greater power than that available under the ordinary power of subpena upon a mere demand, the refusal of which can be made the subject of a contempt of court and the failure to meet the statutory requirement is made a criminal offense. All the election records of each State of the United States are made available to him for a period of 2 years. Such an extraordinary grant of power should be denied to anyone. This mere fact alone would be sufficient grounds for rejection of title III.

In addition, this proposal would place an undue financial burden upon the States, a burden in which the Federal Government would have no share.

TITLE IV—EXTENDING CIVIL RIGHTS COMMISSION FOR 2 YEARS

Title IV of H.R. 8601 would extend the Civil Rights Commission for 2 additional years with the requirement that it should submit an interim report to the President and Congress not later than September 1, 1959, and a final report not later than September 9, 1961. The present law would require the final report to be submitted not later than September 9, 1959. In addition, title IV would authorize members of the Commission to administer oaths and also repeal the requirement that its personnel be employed under the civil service and classification laws.

At this very moment, the constitutionality of the Civil Rights Act of 1957 is under attack in the Federal district court in Louisiana. In addition, no report has been filed to date by the Commission on any of its activities. It has submitted copies of its hearings held recently in Alabama in regard to voting. The testimony during the course of the hearings before the subcommittee of the House Judiciary Committee indicated that it has undertaken studies in the fields not only of voting but also in housing and education. As to the latter two subjects, no reports have been made as yet.

The Commission's initial public hearing in December 1958 in Montgomery, Ala., concerning denial of voting rights have been published. However, in connection with that hearing, there has been extended litigation concerning the Commission's right to inspect election records. A U.S. district court ruled that under the Civil Rights Act of 1957, the Attorney General under the enforcement provisions of the Commission's subpena power could not name a State as a party to such an action. That decision has been affirmed by the Court of Appeals for the Fifth Circuit.

When the provision to create this Commission was under consideration in 1957, the opponents of the legislation pointed out the inconsistency of establishing a commission to make a study of certain aspects of the civil rights problem and, at the same time in the same bill, asked the Congress to enact statutes on the very same subject matter. We maintained then that such an enactment placed upon the statute books of the United States would be a statutory paradox. In the proposal of H.R. 8601, the same assertion is true. The Commission has undertaken studies in the fields of school desegregation, voting and housing, yet in this same bill, H.R. 8601, Congress has asked to enact a criminal statute for violation of Federal court orders involving school desegregation, in title V we are asked to amend existing law to provide for the education of children of certain members of the Armed Forces when local public schools are closed because of desegregation orders and, finally, we are asked to enact legislation for the preservation of Federal election records.

Why is there a need to extend the Commission—a Commission from which no report has been forthcoming—if we as legislators are to proceed on the very same subjects, namely, voting rights and education. Either we need the study and report and therefore should await the same, or there is no need for the Commission if titles I, III, and V are necessary.

If the experience of the Commission to date is indicative of what will be accomplished during a 2-year extension, it means that nothing will be served by such an extension. To date, nothing has been reported, nothing has been recommended. In the opinion of many, the Commission has defeated the very purpose for which it was created. Instead of the greater public understanding of civil rights and the charting of a course of progress in the years to come, the activities of the Commission appear to have accomplished the direct opposite. The result has been ill feelings on the part of many of our people, that there has been undue interference particularly in the voting area by the Commission as indicated by the litigation which has resulted. As for a chart of progress to guide us in the future, there has been neither the chart nor a recommendation. Thus, there appears to be no need nor reason why the Commission on Civil Rights should be extended for an additional 2 years.

TITLE V—EDUCATION OF CHILDREN OF MEMBERS OF THE ARMED FORCES

This title would amend Public Laws 815 and 874 of the 81st Congress, as amended, which authorized payment to school districts which provide free public education to children whose parent resided or works on Federal property which is not subject to State or local taxation. The amendment proposed by this title to the present laws would enable the Commissioner of Education and the armed services concerned to provide for the education of children of military personnel, regardless of where they live, when the public schools are closed to them. Under existing law, the Commissioner cannot provide for the education of children of members of the Armed Forces who live off Federal property. The proposed title would authorize the Commissioner to make temporary provision for such school facilities as may be necessary for the education of those children of members of the Armed Forces who reside off Federal property.

The title would also authorize the Commissioner to acquire possession of any school building constructed with the aid of Federal funds after the enactment of this title, when the local educational agency which owns the building is no longer using it for free public education and the Commissioner needs the building to provide education to these children of military personnel or for other children who reside on Federal property. Provision is made for the payment of a rental fee by the Commissioner which would be proportionate to its share in the costs of constructing the building so long as the school structure remains in Federal possession.

We add this word of caution. Under the existing law and the amendments thereto proposed in this title the Federal Government comes into the educational picture when, among other conditions, it is the judgment of the Commissioner that no local educational agency is able to provide suitable free public education. What is the limit of the power thereby vested in the Commissioner in the exercise of his judgment as to what constitutes "suitable free public education"?

This title, like title II, is not relevant to the purpose and subject matter of the overall proposal of the bill H.R. 8601. Legislation of this type comes under the Rules of the House of Representatives within the jurisdiction of the Committee on Education and Labor. In fact, the executive communication from the Secretary of the Department of Health, Education, and Welfare to the Speaker of the House of Representatives, dated February 5, 1959, was referred to that committee.

It should be noted that the proposed amendments of this title to Public Law 815 of the 81st Congress, as amended, may be an opening wedge for the entrance of the Federal Government into eventual control of public school education throughout this land.

Section 502 of the bill requires the applying educational agency to assure the Commissioner, should a school building erected with Federal funds under an application approved after the enactment of the bill, that the building will be made available for use by the Commissioner to educate children not only of members of the Armed Forces but also of other Federal employees residing on Federal properties. The conditions under which this assurance would come into being would be in the case where the local school facility is no longer providing free public education and the Commissioner needs the facility to provide education for those children herein above mentioned.

In effect, this proposed amendment means that whenever there is need for the construction of a new school, following the enactment of this proposal, that school, if it wants Federal financial assistance, must knuckle down to a Federal requirement that if the school is closed and the Federal Government needs it, it will be available to the Commissioner of Education. The return of such property is subject to the Commissioner's discretion.

Such a proposal, while it does not state so, in so many words, means that if a public school is closed under State law in the face of a school desegregation court order, it may be subject to possession by the Federal Government so long as it needs it. Moreover, the operation of such a school by the Federal Government for the children of certain Federal employees and of members of the Armed Forces would be operated on an integrated basis.

The effect and the ramifications of such a situation is self-evident to any and all who oppose Federal intervention in the education of the children of Federal personnel. It is the opinion of the undersigned that this is a "backdoor approach," a Federal aid to education which ultimately means Federal control of education. The adage "the power to subsidize is the power to control" would find personification in the enactment of section 502 as contained in title V of this bill.

E. E. WILLIS.
RICHARD H. POFF.
JOHN DOWDY.
E. L. FORRESTER.
ROBERT T. ASHMORE.
BASIL L. WHITENER.
FRANK CHELF.
WM. M. TUCK.
J. CARLTON LOSER.
WILLIAM C. CRAMER.

O