UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

STATE OF OREGON; and TOBIAS READ,
*in his official capacity as the Oregon
Secretary of State*,

        Defendants.

Case No. 6:25-cv-01666-MTK

**OPINION AND ORDER**

**KASUBHAI,** United States District Judge:

     Plaintiff United States of America brings claims against Defendants State of Oregon and Oregon Secretary of State Tobias Read for alleged violations of the National Voter Registration Act, the Help America Vote Act, and Title III of the Civil Rights Act of 1960. On December 5, 2025, the Court granted Our Oregon, Daniel DiIulio, Stephen Gomez, and Emma Craddock's ("Intervenors") Motion to Intervene as Defendants. ECF No. 52. Before the Court are Defendants' Motion to Dismiss (ECF No. 32) and Intervenors' Motion to Dismiss (ECF No. 31). For the reasons discussed below, Defendants' and Intervenors' motions are granted.

## BACKGROUND

     Plaintiff filed this action pursuant to the National Voter Registration Act, the Help America Vote Act, and Title III of the Civil Rights Act of 1960, asking the Court to order Defendants to provide an unredacted electronic copy of the State of Oregon's complete voter

registration list. Defendants contend the three federal statutes Plaintiff relies upon simply fail

provide a legal basis for the requested relief. The Court agrees.

## I.    Legal Background

Because this action implicates principles of federalism and separation of powers in

federal election oversight, the Court begins by describing the respective roles of the states and

the federal government in election regulation and administration. The relevant constitutional and

statutory provisions include: (A) The Elections Clause and (B) three federal statutes that provide

specific narrows roles for the federal government involvement in election regulation—the

National Voter Registration Act, the Help America Vote Act, and Title III of the Civil Rights Act

of 1960.

### A.    States' Roles in Elections

The Constitution explicitly empowers, in the first instance, the states to regulate and

administer elections. The Elections Clause provides: "The Times, Places and Manner of holding

Elections for Senators and Representatives, shall be prescribed in each State by the Legislature

thereof; but the Congress may at any time by Law make or alter such Regulations . . . ." U.S.

Const. art. I, § 4, cl. 1. "[T]imes, places and manner . . . [are] comprehensive words [that]

embrace authority to provide a complete code for congressional elections, not only as to times

and places, but in relation to notices, registration, supervision of voting, protection of voters,

prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers,

and making and publication of elections returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932). The

United States Constitution through the Elections Clause entrusts the broad, regulatory authority

over elections to the states.

In addition to the responsibility of enacting regulations and procedures for federal

elections, the Elections Clause tasks states with administering elections. *Gonzalez v. Arizona*,

677 F.3d 383, 391 (9th Cir. 2012) ("[A] state's role … under the Elections Clause is to administer the elections through its own procedures . . . ."); *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 796 (7th Cir. 1995) ("Article I section 4 . . . places the burden of administering federal elections on the states."). The Framers of the Constitution chose to entrust the states with administering elections because local governments are best acquainted with the situations of the people they govern. *United States v. Gradwell*, 243 U.S. 476, 484 (1917). "All other things being equal, it is generally better for states to administer elections. . . . [L]ocal administration . . . allows for great individual input and accountability." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 715-16 (4th Cir. 2016).

While the Election Clause recognizes the states' first right to manage and administer elections, Congress may preempt state laws governing elections. *See* U.S. Const. art. I, § 4, cl. 1 ("Congress may at any time by Law make or alter such Regulations . . . ."). Congress exerts its preemptory authority through "positive and clear statutes." *Gradwell*, 243 U.S. at 485.

### B.    Statutory Provisions

Plaintiff invokes the supposed authority under the National Voter Registration Act, the Help America Vote Act, and Title III of the Civil Rights Act of 1960 to compel Defendants to disclose to it Oregon's unredacted voter registration list. These three statutes, however, create specific and narrow roles for the federal government in the states' regulation of elections and cannot give Plaintiff what it seeks.

### 1.    National Voter Registration Act ("NVRA")

In 1993, Congress enacted the NVRA and created a limited role for the federal government relating to state voter registration systems. 52 U.S.C. § 20501 *et seq*. Through the NVRA, Congress sought to balance two "competing interests:" "easing barriers to registration and voting, while at the same time protecting electoral integrity and the maintenance of accurate

voter rolls." *Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019). Congress was wary of "the devastating impact purging efforts previously had on the electorate" and the misuse of such mechanisms that could deprive citizens of their fundamental right to cast a ballot. *Am. Civil Rights Union v. Phila. City Comm'n*, 872 F.3d 175, 178 (3rd Cir. 2017).

The NVRA contains four stated purposes: (1) "to increase the number of eligible citizens who register to vote" in federal elections, (2) "to enhance[] the participation of eligible citizens as voters," (3) "to protect the integrity of the electoral process," and (4) "to ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). The main provisions of the NVRA direct states to ensure that any eligible applicants are registered to vote, ensure registrants are not removed except under specified circumstances, and conduct a general program to remove ineligible voters from official voter registration lists. 52 U.S.C. § 20507(a). States must make "a reasonable effort" to remove ineligible voters from the official voter list upon request, ineligibility due to a criminal conviction or mental incapacity, death, or change of address. 52 U.S.C. § 20507(a)(3)-(4). The NVRA also requires states to maintain "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," for at least two years, and to make such records available for public inspection. 52 U.S.C. § 20507(i)(1).

The NVRA provides for civil enforcement actions by the Attorney General in the appropriate district court "for such declaratory or injunctive relief as is necessary" to carry out the obligations provided by statute. 52 U.S.C. § 20510(a). The federal government may seek an injunction commanding compliance with the NVRA when a state does not comply with its provisions. *ACORN*, 56 F.3d at 798.

2.    Help America Vote Act ("HAVA")

Congress enacted HAVA "[i]n the wake of the 2000 presidential election." *Crowley v. Nevada ex rel. Nevada Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012). Congress intended HAVA "to alleviate a 'significant problem voters experience [, which] is to arrive at the polling place believing that they are eligible to vote, and then to be turned away because the election workers cannot find their names on the list of qualified voters.'" *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004) (quoting H.R. Rep. No. 107–329 at 38 (2001)).

Through HAVA, Congress established standards for states' voting systems and voter registration lists. 52 U.S.C. § 21081, 21083. HAVA requires states to implement a centralized computerized statewide voter registration list, and to maintain that list by removing ineligible voters. 52 U.S.C. § 21083(a)(1)(A), (a)(2)(A). The federal government provides states with the necessary funding to ensure compliance with these standards. 52 U.S.C. § 20901. However, Congress deferred to the states in the implementation of HAVA, with "[t]he specific choices on the methods of complying with the requirements . . . left to the discretion of the State." 52 U.S.C. § 21085.

Albeit limited in scope, the Attorney General may bring a civil action against any state to enforce HAVA's requirements. 52 U.S.C. § 21111.

3.    Title III of the Civil Rights Act of 1960 ("Title III")

Title III contains provisions requiring elections officials to retain certain records and allowing the federal government to demand such records. The Civil Rights Act of 1960 was a key follow up to the Civil Rights Act of 1957. Congress first enacted voting provisions in the Civil Rights Act of 1957 to aid the federal government in carrying out its responsibilities under the Fourteenth and Fifteenth Amendments. *United States v. Mayton*, 335 F.2d 153, 159 (5th Cir.

1964). However, Congress "found it necessary to legislate again in 1960 with respect to this

problem of assuring full rights of suffrage to all Americans." *Id.* Title III was part of that

legislation. As best described in the Congressional Record:

> Proof of denial or threatened denial of the right to vote because of racial discrimination requires a showing not only that qualified persons are not permitted to register or vote, but that the denial is based on racial discrimination. This calls for evidence that individuals of a particular race had in fact either satisfactorily demonstrated their qualifications under State law or that they were able to demonstrate their qualifications and had offered to do so and were, nevertheless, not allowed to register or vote, while individuals of another race no better qualified, had been permitted to register or vote.

> To assemble the necessary proof of discrimination is impracticable, if not impossible, without access to detailed information concerning applications, registrations, or other acts, tests, and procedures requisite to voting. From such information, it becomes possible to determine who has been permitted to register or vote and who has not, and to make a breakdown on the basis of race. The only source of such comparative information—necessary for proper evaluation of complaints and in the preparation of cases—is the records of registrations or other action required for exercise of the franchise.

> The Department of Justice has no existing power in civil proceedings to require the production of such records during any investigation it conducts as to complaints that qualified persons have been denied the right to vote in violation of Federal law. The need for this power is evident from the refusal of some State and local authorities to permit inspection.

> Title III is designed to fill this need.

Castelli Decl. Ex. 9 at 4, ECF No. 33-9.

Title III requires election officers to retain and preserve all records related to "any

application, registration, payment of poll tax, or other act requisite to voting" for a period of

twenty-two months after any federal election. 52 U.S.C. § 20701. The Attorney General must

make a demand in writing, containing a statement of "the basis and the purpose therefor" to

inspect state voting records. 52 U.S.C. § 20703. District courts in which the demand is made

have jurisdiction "by appropriate process" to compel record production required under the

statute. 52 U.S.C. § 20705. Title III prohibits the Attorney General and employees of the

Department of Justice from disclosing records produced under its provisions "except to Congress

and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury." 52 U.S.C. § 20704.

## II.    Factual Background

This case arises from demands by way of correspondence between Plaintiff and Defendants in which Plaintiff expected Defendants to provide it with an unredacted electronic copy of the State of Oregon's voter registration list. Defendants refused.

### 1.    Plaintiff's July 16 Letter

On July 16, 2025, Plaintiff sent a letter to Defendant Oregon Secretary of State Tobias Read (hereinafter "Defendant Read") requesting information regarding Oregon's compliance with the statewide voter registration list maintenance provisions of the NVRA. Castelli Decl. Ex. 1 ("July 16 Letter"), ECF No. 33-1. In that letter, Plaintiff demanded an electronic copy of Oregon's computerized, statewide voter registration list, including "all fields contained within the list." *Id.* at 1. Plaintiff asserted this request was pursuant to Section 20507(i) of the NVRA. *Id.* The letter also requested clarification of Oregon's responses to the 2024 Election Assistance Commission's Election Administration and Voting Survey, raising concerns about Oregon's "unusually high" voter registration rate and unusually low voter removal rate. *Id.* at 2. Plaintiff asked Defendant Read to explain what actions Oregon was taking to remove ineligible voters from official voter lists. *Id.* Plaintiff provided a fourteen-day deadline for Oregon to produce the requested information. *Id.* at 3.

### 2.    Plaintiff's August 14 Letter

Plaintiff sent an updated letter on August 14, 2025, demanding that Defendants provide an electronic copy of the state's voter registration list containing "*all fields*, which . . . must include the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number . . . ." Castelli

Decl. Ex. 2 at 1 ("August 14 Letter"), ECF No. 33-2 (emphasis in original). Plaintiff relied on three authorities to support this demand. First, Plaintiff asserted the request for information was "pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions." *Id.* Second, Plaintiff cited its enforcement authority under HAVA. *Id.* at 1-2. Finally, Plaintiff cited Title III for the Attorney General's authority to request the unredacted records. *Id.* at 2. Plaintiff's stated purpose for the Title III demand was "to assess [Oregon's] compliance with the statewide VRL maintenance provisions of the National Voter Registration Act." *Id.* at 1.

### 3.    Defendants' Letter

Defendant Read replied on August 21, 2025. Ex. 3 ("Read Letter"), ECF No. 33-3. He declined to produce the statewide voter registration list with all fields, declaring federal authorities do not have the authority to compel Oregon to disclose an unredacted voter registration list. Castelli Decl. Defendant Read invoked Or. Rev. Stat. § ("ORS") 247.948, which prohibits the disclosure of "a voter's birth month, birth day, Social Security number, and driver's license number." *Id.* at 2. He agreed to produce the publicly available portions of the voter registration list if Plaintiff complied with applicable provisions of the Privacy Act of 1974 and followed the process outlined in Or. Admin. Reg. § 165-002-0020 to request that data. *Id.* Plaintiff rejected Defendant Read's offer and sued.

## STANDARD

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe

them in the light most favorable to the non-moving party. *Id.* To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). All reasonable inferences from the factual allegations must be drawn in favor of the plaintiff. *L.A. Lakers,* 869 F.3d at 800. The court need not, however, credit the plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

Defendants and Intervenors move to dismiss Plaintiff's action because they contend that (1) none of the three statutes on which Plaintiff leans in its Complaint require Defendants to disclose sensitive, personal voter information; and (2) Plaintiff has not complied with the Privacy Act of 1974 or the E-Government Act. Because the Court agrees on the first argument for the reasons addressed below, it does not reach the second.

Before turning to the merits, it is important to clarify what is and is not at issue here. What is not at issue in this case is whether Defendants must produce voter registration list at all; Defendants acknowledge that Oregon law allows for some limited production of this

information. *See* Read Letter 2. Defendants' response to Plaintiff's demand made clear that Defendants stand ready to produce voter registration data as allowed by state law, provided Plaintiff complies with applicable privacy laws. *Id*. However, Defendants have also made clear that they will not produce voters' birth dates, birth months, driver's license numbers, and the last four digits of voters' Social Security numbers (for ease of reference throughout this Opinion, the Court refers to this information as "Sensitive Voter Data"). The question before the Court is whether any of the federal laws Plaintiff relies on entitle it to Defendants' *unredacted* voter registration lists (i.e., the Sensitive Voter Data). With that framework in mind, the Court explains why Plaintiff has failed to state a claim that Defendants refused to provide Sensitive Voter Data in violation of the NVRA, HAVA, or Title III.

## I.     NVRA

Count I of Plaintiff's Complaint alleges that Defendants' failure to produce an unredacted voter registration list violated the NVRA. Defendants and Intervenors argue that this claim should be dismissed because the NVRA does not mandate the disclosure of the Sensitive Voter Data.

Importantly, this is not an action to enforce substantive NVRA provisions. Plaintiff has not alleged, for example, that Defendants have failed to make a "reasonable effort" to remove ineligible voters as the NVRA requires. Instead, Plaintiff seeks the voter registration list to pursue an investigation into possible substantive NVRA violations. The question before the Court is whether there is any provision in the NVRA that requires Defendants to disclose the Sensitive Voter Data.

The NVRA's public disclosure provision mandates states to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" for at least two years and make such

records available for public inspection. 52 U.S.C. § 20507(i)(1). Per the statute, records "shall include lists of the names and addresses of all persons to whom notices . . . are sent, and information concerning whether or not each such person has responded to the notice." 52 U.S.C. § 20507(i)(2). The NVRA contains no other provisions for the disclosure of voter data.

Numerous courts have addressed whether the NVRA requires the disclosure of personal or sensitive information contained in records subject to the NVRA's public disclosure provision. For example, in *Pub. Int. Legal Found., Inc. v. Bellows*, the First Circuit held that "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information" contained in voter registration lists. 92 F.4th 36, 56 (1st Cir. 2024). Similarly, the Fourth Circuit has explained that redaction is appropriate under the NVRA as "necessary to protect sensitive information." *Pub. Int. Legal Found., Inc. v. N. C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021); *see also Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns"); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) ("the NVRA Public Disclosure Provision does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates").

While Plaintiff attempts to distinguish the above case law on the basis that the parties requesting the data in those cases were private organizations rather than the United States Government, Plaintiff does not explain why that distinction warrants a different result in this case. There is no separate disclosure provision applicable to the federal government, and the federal government does not enjoy any intrinsic authority to compel disclosure of these records. Those cases, and this one, all concern states' obligations under the NVRA's public disclosure provision. In fact, at least one court has already applied the reasoning in that case law to a similar

request by Plaintiff in California. *United States v. Weber*, 2026 WL 118807, at *12 (C.D. Cal. Jan. 15, 2026) ("There is longstanding precedent that states are entitled to redact sensitive voter information, like social security numbers and birthdates, under the NVRA and that this information is not relevant to the removal of ineligible voters from voting rolls"). And, as explained in more detail later in this Opinion, Oregon law clearly prohibits Defendants from disclosing the Sensitive Voter Data. *See infra* III.B.2.

Plaintiff fails to state a claim that Defendants' refusal to produce an unredacted voter registration list violated the NVRA's public disclosure provision. That claim is dismissed.

## II.    HAVA

Count II of Plaintiff's Complaint alleges that Oregon's failure to produce an unredacted voter registration list violated HAVA. Defendants and Intervenors contend that this claim should be dismissed because HAVA does not contain any disclosure requirements.

As with its NVRA claim, Plaintiff's HAVA claim is not an action to enforce substantive requirements under HAVA. Instead, Plaintiff claims that Defendants' failure to disclose information Plaintiff believes necessary to investigate HAVA compliance is *itself* a HAVA violation. Plaintiff cites no provision of HAVA that Defendants violated by failing to produce an unredacted voter registration list, nor could it because HAVA contains no record disclosure provision. HAVA grants the Attorney General the ability to bring a civil action for enforcement, not disclosure. Congress knows how to include disclosure provisions, as it did so in both the NVRA and Title III. It did not do so here, and the Court will not play the role of Congress by adding one where it does not exist. *See Peters v. United States*, 853 F.2d 692, 696 (9th Cir. 1988) ("we are reluctant to assume the existence of the power to issue third-party subpoenas directed at unidentified targets where Congress has not provided for them specifically, nor provided procedural safeguards").

Because Plaintiff fails to identify any provision of HAVA that Defendants violated by failing to produce an unredacted voter registration list, Plaintiff has failed to state a claim under HAVA and that claim is also dismissed.

## III.    Title III of the Civil Rights Act of 1960

Count III of Plaintiff's Complaint alleges a violation of Title III of the Civil Rights Act of 1960. The relevant portion of the statute provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. § 20703. Defendants move to dismiss this claim, arguing that Plaintiff did not make a valid demand under Title III and that the statute does not entitle Plaintiff to the records it seeks. The Court agrees that Plaintiff fails to state a claim for relief under Title III because (A) Plaintiff's Title III demand fails to adequately state a basis and purpose; and (B) Title III does not entitle Plaintiff to the Sensitive Voter Data.

### A.    Inadequate Basis and Purpose

Defendants and Intervenors argue that Plaintiff's Title III claim should be dismissed because Plaintiff's demand for the unredacted voter registration list failed to contain a statement of the basis for the demand, and because the stated purpose fails to relate to Title III's purpose of investigating the infringement or denial of voting rights. Plaintiff seeks to convince the Court that demanding voting records under Title III is a "special statutory proceeding" which limits the Court's role in evaluating the basis and purpose of the demand. Pl.'s Opp. 7, ECF No. 57 (citing *Kennedy v. Lynd*, 306 F.2d 222, 225 (5th Cir. 1962)). Before turning to the question of whether Plaintiff's demand contained an adequate statement of basis and purpose, the Court addresses the

threshold question of the scope of the court's judicial review of the adequacy of Plaintiff's demand.

           1.    <u>Judicial Review of a Title III Demand</u>

Plaintiff argues that a Title III written demand requires only a superficial statement that its demand for records is made for the purpose of investigating a violation of a federal statute, and that the Court is precluded from evaluating the legal sufficiency of the statement of basis and purpose. In support of this argument, Plaintiff relies on several Fifth Circuit cases from the early 1960s: *Lynd*, 306 F.2d 222, *Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962), and *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). In *Lynd*, the Fifth Circuit considered its role in evaluating a Title III demand by the Attorney General for voter records he believed to be necessary to investigate the infringement or denial of constitutional voting rights. The court explained that Title III creates a "special statutory proceeding . . . [that] does not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure." *Lynd*, 306 F.2d at 225-26. Because the procedure is a creature of statute, the Fifth Circuit reasoned, "[t]here is no place for any other procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Id.* at 226.

Here, however, the Court concludes that its role in evaluating Plaintiff's statement of basis and purpose is not so limited. Plaintiff has cited no binding authority for its proposition, nor even any cases which apply *Lynd* and the other Fifth Circuit decisions within the last sixty years. Instead, the starting point is the relevant language of Title III: "The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel

the production of such record or paper." 52 U.S.C. § 20705. The statute does not define what that "appropriate process" is.

As Defendants and Intervenors point out, the Supreme Court interpreted a similar statute just two years after *Lynd*, in *United States v. Powell*, 379 U.S. 48 (1964). Like Title III, the statute at issue in *Powell* confers jurisdiction on district courts "by appropriate process to compel" compliance with federal document demands. *See* 26 U.S.C. § 7604(a). Interpreting that statute, the Supreme Court explained, "Because [§] 7604(a) contains no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply" and the court may "inquire into the underlying reasons for the examination [of records]." *Powell*, 379 U.S. at 58 & n. 18.

The Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*.[1] Accordingly, the Court applies the Federal Rules of Civil Procedure as in any other case. There is no current or binding authority for the proposition that Title III precludes the Court from evaluating the sufficiency of Plaintiff's allegations regarding Defendants' alleged failure to comply with Title III, including whether—applying Rule 12(b)(6) standards—a valid Title III demand was made in the first place. Accordingly, the Court moves on to address Defendants' and Intervenors' arguments that Plaintiff failed to state a claim under Title III because Plaintiff's demand failed to state an adequate basis and purpose.

---

[1] Even if *Lynd* applied here, the Court doubts its applicability here where Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation. By contrast, *Lynd* appears to contemplate an application directly to the court for the records. 306 F.2d at 225 ("*the filing of the application* by the Attorney General is not the commencement of an ordinary, traditional civil action with all of its trappings") (emphasis added).

2.      Plaintiff's "Basis"

As previously noted, a Title III demand must be accompanied by "a statement of the basis and the purpose" for the demand. 52 U.S.C. § 20703. Plaintiff's Title III demand here occurred in its August 14 Letter. Defendants argue that, while the August 14 Letter contained a statement of purported purpose for the demand, it did not contain any separate statement of the basis for it. Plaintiff, in turn, contends (1) that "basis" refers to a legal basis rather than a factual one, and its citation to the NVRA and HAVA was sufficient; and (2) that even if a factual basis were required under Title III, the basis for the demand can be found in its prior July 16 Letter.

Plaintiff first argues that "basis" refers to the *legal* basis for the investigation (i.e. the federal statute giving rise to the investigation) rather than a *factual* basis for pursuing that investigation. The Court is not persuaded. Other than *Lynd*[2], Plaintiff identifies no authority supporting its argument that "basis" means merely identifying any federal statute, regardless of its relation to civil rights violations, that Plaintiff believes may have been violated. Such a reading would give Plaintiff virtually limitless access to records required to be maintained under Title III. Even the demand in *Lynd* included a factual basis separate from its stated purpose: "This demand is based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." 306 F.2d at 229 n. 6.

Reading "basis" in the way Plaintiff suggests collapses its meaning with that of "purpose." Title III explicitly requires a statement of "the basis *and* the purpose." 52 U.S.C. §

_____

[2] To the extent that Plaintiff's argument depends on the Fifth Circuit's general conclusion in *Lynd* regarding the limited scope of judicial review (and it is unclear because this argument was only clearly articulated for the first time at oral argument), the Court has already explained why the Supreme Court's decision in *Powell* requires the Court to exercise full judicial review and evaluate the reasons for the demand with more scrutiny than *Lynd* suggests.

20703 (emphasis added). When "'and' is used to join two concepts, it is usually interpreted to require 'not one or the other, but both.'" *Confederated Tribes & Bands of Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 990 (9th Cir. 2020) (quoting *Crooks v. Harrelson*, 282 U.S. 55, 58 (1930)). The problem with Plaintiff's interpretation is patently evident from the statement in its own demand, which Plaintiff contends comprises both the purpose and the basis: "The purpose of the request is to ascertain Oregon's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter 2. If the purpose is to investigate violations of a statute, the basis must be something else; the statute underlying the investigation is nothing more than a component of the purpose. Plaintiff's interpretation fails to give full meaning to both "basis" and "purpose." The Court understands "basis" to mean a factual basis for investigating a violation of a federal statute.

Plaintiff's August 14 Letter contains no statement of a factual basis for believing Oregon violated the NVRA or HAVA. Plaintiff urges the Court to look instead to its July 16 Letter for that factual basis. But the July 16 Letter contains no Title III demand, and the August 14 Letter's Title III demand does not identify the information in the July 16 Letter as its factual basis. Plaintiff's patchwork and post hoc effort to stitch together a legally sufficient "statement of the basis" fails.

3.    Plaintiff's "Purpose"

Plaintiff's August 14 Letter did contain an explicit statement of the purpose for its Title III demand: "to ascertain Oregon's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter 2.  Defendants and Intervenors argue that Plaintiff's stated purpose is insufficient because it is unrelated to the purpose of Title III, which is to protect against the infringement or denial of voting rights. Plaintiff argues that Title III's text does not constrain the purposes for which Plaintiff may use its investigatory power to demand voting

records under the statute, and that it may demand such records for the purpose of investigating the violation of any federal statute.

Whether "purpose" can be read as broadly as Plaintiff suggests is a question of statutory interpretation. "In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). Words in a statute are interpreted "not in a vacuum, but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)).

Congress specifically required that demands for records under Title III "shall" be accompanied by a statement of the purpose for that demand. 52 U.S.C. § 20703. If *any* purpose—regardless of its relationship to the purposes of the statute itself—would suffice, then the requirement of stating the demand's purpose would serve no function. The Court cannot read "purpose" so broadly that it would "sap the interpreted provision of all practical significance." *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nickels*, 150 F.4th 1260, 1273 (9th Cir. 2025). This concern is especially true here, where Plaintiff's reading would grant it unfettered authority to demand voting records for *any* purpose. Ironically, while also arguing that Defendants are attempting to "engraft[] a requirement of racial discrimination that does not exist in the statute," Pl.'s Opp. 8, Plaintiff's argument engrafts its own requirement that does not appear in the statute. Plaintiff contends that the purpose must relate to an investigation into a violation of a federal statute, but that limitation on "purpose" does not appear in the statute, either. Following Plaintiff's reading of the statute to its logical conclusion, Title III would allow Plaintiff access to those records for *any* purpose it put into writing in its demand. Here, the Court cannot conclude

that Congress intended to grant Plaintiff such expansive and unfettered authority to invade citizens' right to keep their sensitive information private. *See West Virginia v. Env't Prot. Agency*, 597 U.S. 697, 721 (2022) ("Where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted") (internal quotations and citation omitted). "Purpose" must have some constraints, or its requirement would be meaningless.

In determining what "purpose" is sufficient for a Title III demand, the Court considers the larger framework of Title III and the historical context in which it was enacted. *See County of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1022 (9th Cir. 2017) ("understanding the historical context in which a statute was passed can help to elucidate the statute's purpose and the meaning of statutory terms and phrases"). The Court offered some historical context for Title III earlier in this Opinion, and a review of its history directs the conclusion that it was intended to protect against the infringement of voting rights.

*Lynd*, the very same case on which Plaintiff so heavily relies, is consistent with this interpretation of Title III's purpose. *Lynd* explains that the purpose of Title III's record demand provision is "to enable the Attorney General to determine whether § 1971 [voting rights] suits or similar actions should be instituted . . . [and] to enable him to obtain evidence for use in such cases if and when filed." 306 F.2d at 228. In *Lynd* and other cases of that era, Plaintiff's then use of Title III remained consistent with this Court's current interpretation of "purpose." *See, e.g., id.* at 229 n. 6 ("The purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred"); *In*

*re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (same), *aff'd sub nom. Coleman*, 313 F.2d at 868; *Bruce*, 298 F.2d at 861 (same).[3]

Reading Title III's text within its larger statutory and historical context, and consistent with the case law and legislative history explained above, the Court concludes that the "purpose" required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights. But here, Plaintiff's stated purpose was to investigate list maintenance procedures. Plaintiff's state purpose lacked any reference or relation to the purposes for which Title III was enacted.[4] Plaintiff's demand for records is deficient and cannot trigger any duty to produce such records. Plaintiff fails to state a claim under Title III.

### B.    Entitlement to Unredacted Records[5]

Defendants and Intervenors also contend that, even if Plaintiff's Title III demand contained an adequate statement of its basis and purpose, Title III does not require the disclosure of unredacted records. As explained above, Defendants have already conceded that Plaintiff is entitled to voter registration lists in compliance with Oregon law; Defendants seek only to redact the Sensitive Voter Data. Plaintiff, nevertheless, contends that Title III does not limit the records so long as they are those required to be retained and preserved under 52 U.S.C. § 20701.

---

[3] While Plaintiff provides some supplemental authority identifying two cases in 2006 and 2008 in which it sought records under Title III for NVRA-compliance purposes, ECF No. 67, neither case required any court to decide whether that was a permitted use of Title III.

[4] Even if investigating NVRA or HAVA compliance were valid purposes for seeking voter registration lists under Title III, neither Plaintiff's Title III demand nor any of its pleadings before this Court provide any reasonable explanation for why the Sensitive Voter Data in particular serves those purposes.

[5] Although it is not strictly necessary for the Court to address this argument in light of its conclusion that Plaintiff failed to include an adequate statement of basis and purpose for its demand, the issues raised by the scope of Plaintiff's demand here are deeply troubling and are an important alternative basis for granting Defendants' and Intervenors' motions.

1.    <u>Interest in Protection of Sensitive Voter Data</u>

Before addressing the parties' specific legal arguments on the motions to dismiss on this basis, the Court begins by addressing Defendants' and Intervenors' interests in protecting the Sensitive Voter Data. A consistent theme in Plaintiff's briefing and oral argument was its assurance that the information would be protected by applicable privacy laws as well as by Title III's prohibition on disclosure of records obtained by the Department of Justice. Plaintiff also assures that it only seeks the records to investigate compliance with the NVRA and HAVA. In the face of these assurances, the Court must respond.

Although Plaintiff's Complaint discusses Oregon-specific concerns about voter list maintenance, Compl. ¶¶ 39-44, ECF No. 1, Plaintiff has in fact requested the same statewide voter registration lists in states across the country. As of December 22, 2025 (when the replies in this case were filed), Plaintiff filed lawsuits against 20 states plus the District of Columbia seeking the same information. *See* Intervenors' Reply 1 n. 1, ECF No. 60 (collecting cases). The Court is aware of at least two more cases Plaintiff has filed against states since then. *United States v. Fontes*, No. 2:26-cv-00066-SMB (D. Ariz. Jan. 6, 2026); *United States v. Thomas*, No. 3:26-cv-00021-KAD (D. Conn. Jan. 6, 2026). As U.S. District Judge Carter recently noted in one of these parallel cases in California, "[i]t appears that DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 2026 WL 118807, at *10. The court there cited numerous sources raising significant concerns about the true purpose of Plaintiff's voter data requests across the states. *Id.* at *10-12. In particular, the court expressed concerns that the data was in fact being aggregated in part for the purposes of immigration enforcement and that Plaintiff's assertions that the data was being requested for NVRA or HAVA compliance were "pretextual." *Id.* at *11-12.

Even since the decision in *Weber* was issued, Plaintiff has continued to engage in conduct raising suspicion about the purposes for which it seeks statewide unredacted voter registration lists. On January 24, 2026, Attorney General Pamela Bondi sent a letter to Minnesota Governor Tim Walz regarding immigration enforcement in Minnesota. Letter from Pamela Bondi, Att'y Gen., to Tim Walz, Governor of Minn. (Jan. 24, 2026).[6] The letter details the Attorney General's views about the state of "lawlessness" regarding immigration enforcement in Minnesota and concludes with a list of demands to "restore the rule of law" through "common sense solutions." *Id.* Among those is a demand for Minnesota to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960." *Id.* The context of this demand within a letter about immigration enforcement casts serious doubt as to the true purposes for which Plaintiff is seeking voter registration lists in this and other cases, and what it intends to do with that data.

While the Court's decision granting Defendants' and Intervenors' motions to dismiss are firmly grounded on the application of law, Plaintiff's conduct and written demands on states for disclosure of their highly sensitive voter information should not be ignored. Defendants' and Intervenors' expressed concerns about Plaintiff's ulterior motives for seeking the sensitive data require attention. The presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds. When Plaintiff, in this case, conveys assurances that any private and sensitive data

---

[6] available at https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html (Last accessed Feb. 2, 2026).

will remain private and used only for a declared and limited purpose, it must be thoroughly
scrutinized and squared with its open and public statements to the contrary.

      2.    <u>Defendants' Disclosure Obligation under Title III</u>

Defendants and Intervenors argue that Title III does not obligate Defendants to disclose
the Sensitive Voter Data and that they are in fact prohibited from doing so under Oregon law.
Under ORS 247.948(2), the birth day, month, social security number, and driver license numbers
in voter registration files "may not be disclosed by the Secretary of State or a county clerk"
except as "otherwise required by law." The question is whether that information is required
under Title III. Plaintiff's only response to this argument is a conclusory footnote in which it
states without substantive argument or citation to binding legal authority that "to the extent
Oregon law purports to bar the United States from obtaining federal election data necessary to
enforce the NVRA, that conflicting law is preempted." *See* Pl.'s Opp. 14 n. 6 (citing *Voter
Reference Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025)).

Plaintiff fails to establish that Title III preempts Oregon's prohibition on producing the
Sensitive Voter Data. The sole, non-precedential case Plaintiff cites for its undeveloped
preemption theory, *Voter Reference Found.*, is inapposite. There, the Tenth Circuit held that the
NVRA preempted a New Mexico state law restricting the use and sharing of voter data subject to
disclosure under the NVRA. *Voter Reference Found.*, 160 F.4th at 1082-84. In particular, the
Court explained that restricting public access to voter data obstructed the NVRA's "enumerated
purposes of public inspection and circulation of voter data" and was therefore preempted. *Id.* at
1083.

The mere citation to *Voter Reference Found.* does not do the work of explaining how
preemption applies here, where both the federal statute and state statute at issue are different.
Plaintiff does not explain how Oregon law's prohibition on disclosure of certain sensitive

information conflicts with the purposes of Title III. In fact, when the difference between the law at issue in New Mexico and that at issue here is accounted for, *Voter Reference Found.* supports Defendants' and Intervenors' positions, not Plaintiff's. The law at issue in that case categorically prohibited the use and sharing of voter data under certain circumstances; it did not pertain to redaction of private information within that data. Although the question was not before it, the Tenth Circuit explicitly addressed whether the NVRA precludes redaction of private voter data. Citing New Mexico's version of ORS 247.948(2), the court explained that "[t]o the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation." *Voter Reference Found.*, 160 F.4th at 1083 n. 14.

Other case law supports Defendants' redaction of this data as well. The Fifth Circuit in *Lynd* was clear about the types of records available under Title III, explaining that "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection. . . ." 306 F.2d at 231. Likewise, the vast array of cases cited above addressing the propriety of redaction in the context of the NVRA confirm that such redaction is appropriate and permissible. *See supra* I. Plaintiff fails to provide any persuasive argument that Title III requires Defendants to disclose specific types of information they are prohibited from disclosing under Oregon law.

Because Title III does not require Defendants to disclose the Sensitive Voter Data, Plaintiff fails to state a claim that Oregon violated Title III by failing to produce an unredacted copy of its voter registration list. Count III is dismissed for that additional reason.

## IV.    Leave to Amend

Ordinarily, when a court dismisses a case for failure to state a claim, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Yagman v. Garcetti*, 852

F.3d 859, 863 (9th Cir. 2017). Here, there can be no allegations of additional facts that could cure the deficiencies identified in this Opinion. First, Defendants have already offered to provide Plaintiff with the information required under the NVRA subject to redactions of the Sensitive Voter Data, and no additional facts could alter this Court's conclusion that the NVRA allows such redactions. Second, no additional facts could cure the absence of any disclosure provision in HAVA. Finally, the deficiencies in Plaintiff's Title III demand are plain on the face of Plaintiff's August 14 Letter, and additional facts cannot alter the contents of that letter. Because amendment would be futile, the Court denies leave to amend.

## CONCLUSION

Plaintiff's claims in this case are troubling for several reasons. First, the law upon which Plaintiff relies to compel Oregon to disclose the Sensitive Voter Data is unavailing and its claims fail as a matter of law.

Second, and as discussed earlier, the Constitution specifically left the regulation and administration of elections to the states, understanding that states are in the best position to do so. While the Constitution provides for Congress to preempt the role of the states in elections, Congress has only done so in limited ways. Plaintiff's claims here represent an overreach and misuse of those limited constitutional exceptions designed to ensure decentralized election regulation. Plaintiff's claims disturb the framework of federalism envisioned and enshrined in our Constitution.

Lastly, Plaintiff's words and actions outside of the four corners of its Complaint in this case, including statements that it intends to create a nationwide database of confidential voter information and use it in unprecedented ways, including immigration enforcement efforts, is chilling. The possibility that Oregon's voter registration list could be used to further these efforts

in the absence of congressional action, may very well lead to an erosion of voting rights and voter participation.

 For the reasons discussed in the body of this Opinion, Defendants' and Intervenors' Motions to Dismiss (ECF Nos. 31, 32) are GRANTED. This case is DISMISSED WITHOUT LEAVE TO AMEND.

 DATED this 5th day of February 2026.

s/ Mustafa T. Kasubhai
MUSTAFA T. KASUBHAI (he/him)
United States District Judge